Kenneth JOHNSON, as Personal Representative of the Estate of Carlos Clintell Johnson, a deceased minor, and Kenneth Johnson, individually and Brenda Johnson, individually, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

Kenneth JOHNSON, as Personal Representative of the Estate of Carlos Clintell Johnson, a deceased minor, and Kenneth Johnson, individually and Brenda Johnson, individually, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

Nos. 84–5308, 84–5347.

United States Court of Appeals, Eleventh Circuit.

Jan. 21, 1986.

* Honorable Eugene A. Wright, Senior U.S. Circuit Judge of the Ninth Circuit, sitting by designation.

Stanley Marcus, U.S. Atty., Jeffrey D. Fisher and Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for defendant-appellant.

Charles Stack, High, Stack, Lazenby, Bender, Palahach & Lacasa, P.A., and Philip J. Cole, Coral Gables, Fla., for plaintiffs-appellees.

Before RONEY and KRAVITCH, Circuit Judges, and THOMAS *, District Judge.

RONEY, Circuit Judge:

In this medical malpractice action brought under the Federal Torts Claims Act (FTCA), the United States appeals from a $2 million judgment awarded to the plaintiffs, parents of an infant who died of iron poisoning. Plaintiffs cross-appeal the denial of attorney's fees. The Government challenges a variety of evidentiary rulings, certain "outside research" of the trial judge, numerous factual findings, the taxing of costs, and the amount of damages. We vacate and remand because a Government expert witness was erroneously precluded from testifying and because the verdict is excessive and appears to be based on considerations inappropriate in a tort claims case. The denial of attorney's fees is affirmed because this Court has recently decided that attorney's fees may not be awarded against the United States in a case of this kind.

Early on the morning of November 2, 1980, plaintiffs' twenty-one-month-old son, Carlos, consumed a large quantity of iron tablets. Carlos became ill and was taken by his parents to Homestead Air Force Base Hospital (Homestead) where he was treated for acute iron intoxication. At approximately 2:00 p.m. he was transferred to Jackson Memorial Hospital (Jackson Memorial) where he died shortly after midnight.

Many facts in this case were vigorously disputed: the number of pills the child ingested, the time at which he ingested them, the date on which the mother received the pills which would indicate the number of pills left on the date of ingestion, the amount of time that elapsed between the parents' discovery of the child's illness and their arrival at Homestead, and the accuracy of a lab slip indicating a "free iron level" of 9170 micrograms per deciliter (mg/dl). These disputed facts bear on the degree of iron toxicity in the child's system

present at various times, whether Carlos' life might have been saved given proper and timely treatment, and what party, if any, was at fault for not correctly identifying or treating the condition. The trial court concluded that at least ten specific actions by Homestead fell below the standard of care required of that type of medical facility, and that its more than three-hour delay in administering deferoxamine (an iron antidote) and its failure to transfer him to a higher care facility sooner, caused Carlos' death. The Government contended that Carlos would have died regardless of the treatment that could have been given him.

### I. *Exclusion of the Expert Witness*

The Government contends that the trial court abused its discretion in excluding the testimony of Dr. Albert Rauber, professor of Pediatrics at Emory University Medical School in Atlanta, and director of the Poison Control Center.

When the Government sought to produce Dr. Rauber as its third expert witness, counsel became involved in a vigorous dispute over whether the Government had waived its right to call Dr. Rauber when it allegedly stipulated regarding experts. The trial court was obviously troubled over this dispute and stated that counsel had put the court in a difficult position. At the end of the colloquy, the court indicated that it would exclude Dr. Rauber's testimony because of the stipulation but then stated that it would also exercise its discretion to limit the number of witnesses under Fed.R. Evid. 403. After that, Government counsel was permitted to proffer Dr. Rauber's expected testimony.

Our review of the record leads us to the conclusion that the alleged stipulation relied on by plaintiffs was in fact limited to an agreement that each party would allow two experts to be deposed without subpoena. It does not appear that the Government explicitly waived its right to call more

---

* Honorable Daniel H. Thomas, U.S. District Judge for the Southern District of Alabama, sitting by designation.

than two experts at trial, nor did it ever explicitly waive its right to call Dr. Rauber.

Analysis of this issue, therefore, turns on Rule 403. Under Rule 403, relevant evidence may be excluded for considerations of undue delay, waste of time, or needless presentation of cumulative evidence. The power to conduct orderly trials includes the power to exclude or limit expert testimony. *United States v. Thevis*, 665 F.2d 616, 633–34 (5th Cir. Unit B 1982) (criminal trial); *Campbell Industries v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980). "Rule 403 does not mean that a court may exclude evidence that will cause delay regardless of its probative value. If the evidence is crucial the judge would abuse his discretion in excluding it." Weinstein's Evidence, Para. 403[06] at 403–59–60 (1982).

The propriety of excluding Dr. Rauber's testimony under Rule 403 turns on whether his testimony would have been cumulative. Two expert witnesses testified at trial for the Government. Dr. James Hillman, Director of Pediatric Emergency Care Center, Tampa General Hospital, and Medical Director of the Tampa Bay Medical Poison Control Center was of the opinion that it would have made no difference whatsoever if Carlos had begun receiving intravenous (I.V.) desferal (an iron antidote) the minute he entered Homestead because it would, even then, not have been possible to bind (neutralize) all the free iron in his blood fast enough to save him. In his opinion the only chance of saving Carlos' life would have been to begin treatment within twenty minutes of ingestion. Dr. Hillman testified that Homestead did as good a job as they could have, given the facility and the circumstances. Despite seeming to acknowledge that the deferoxamine and the I.V. treatments could have begun somewhat earlier, and the Homestead medical records could have been more complete, he was still of the opinion that this had no impact whatsoever on Carlos' death. When responding to the court's questions about dialysis or transfusions as a mode of treatment, Dr. Hillman responded that the problem was that transfusions only provide access to circulating blood while the poison, here iron, is in the tissues and in "many different spaces." Therefore, although iron might be removed from the blood, there is no corresponding clinical improvement in the patient. Similarly, he believed deferoxamine would have been of limited, if any, help because it only binds one iron tablet every three hours, while the intestines and tissues continue to absorb the iron. When questioned about Carlos' serum iron level, free iron level, total iron level and binding capacity, Dr. Hillman testified that because Carlos' iron level was over 9000 mg/dl at 3:00 p.m. by a conservative estimate, it was 25% to 30% what it had been within two to three hours of ingestion. This figure "peaks out" early, within two to three hours of ingestion, then "decays" rapidly. For this reason, Dr. Hillman surmised that if Carlos' iron level was 9,000 at three o'clock at least eight hours after ingestion, then it must have been 20,000 or 30,000 at peak value. According to Dr. Hillman, a 1000 mg/dl level is potentially lethal. Dr. Hillman was aware of no child or adult who had survived an iron level in excess of 9,000. He believed Carlos must have ingested "above 40," pills, and "in the 50's at least," to explain the very high iron level so late in the day, that the distribution of pills through the small intestine goes to a long period of ingestion, and that the pills were ingested "very early" in the day.

The second Government expert witness was Dr. Eugene Gitlin, director of medical services, Parkway Regional Medical Center, director of the Emergency Department of that hospital, associate clinical professor at the University of Miami School of Medicine, associate medical director of Dade County Fire Rescue, teacher of Emergency Medicine at the VA hospital and board certified in internal medicine and emergency medicine. Dr. Gitlin was of the opinion that Homestead was within the standard of care required of that type of facility. He concluded that Carlos had ingested a "huge" amount of iron, 50–60 pills was not inconceivable, a lethal dose according to

Dr. Gitlin. A blood iron level over 9000 mg/dl was an "extraordinary level." He testified that even if treatment had been started within an hour of ingestion, Carlos could not have been saved. After reviewing all the documents which were furnished to him, including medical records and statements of the various treating physicians at Jackson Memorial Hospital, Dr. Gitlin concluded that the child could not have been saved even if he had been brought to Jackson Memorial under the conditions specified.

The district court would not admit the testimony of Dr. Albert Rauber. According to the proffer of Government counsel during trial, Dr. Rauber has been a full professor of Pediatrics at Emory University Medical School since 1971. He is the director of the Georgia Poison Control Center and would have been the only expert board qualified in Medical Toxicology. He is also board qualified in Pediatrics.

He would have testified, based on his expertise in Child Behavior, that it is unlikely that Carlos sat down and ate 40–50 pills "at one sitting." This would indicate that the child consumed the pills over a long period of time, allowing more time for absorption prior to arrival at Homestead. In addition, Dr. Rauber was going to "draw on" certain evidence not discussed at trial: medical records, s-g-o-t and s-g-p-t, which are measures of liver and kidney functions. In Dr. Rauber's view, the deterioration in those vital organ functions would not have occurred as rapidly had the child eaten the pills at 7:00 or 7:30 a.m.

Dr. Rauber, like the other Government experts, believed that Homestead's treatment was reasonable and within the standard of care. He would testify that the blood iron level was accurate and very important in that it is a basis from which to go back and "determine the amount of iron that was absorbed, as opposed to ingested." He would also have testified that iron is stored in many places in the body, not just in the blood, so "the absorption of free iron in the blood is not in the process of absorbing iron. It flows in from the tissues and must first be absorbed from the bloodstream."

"Basically," Dr. Rauber's testimony would have been "that drawing free iron out of the blood does not end the absorption of iron, [t]hat it also comes out of the tissues [, and that] the mother's delay in presenting the child in the early time of ingestion was in fact the cause of death...."

It appears Dr. Rauber's testimony would have been based in part on evidence not relied upon by the other experts, namely the liver and kidney function tests. His analysis was somewhat different. His testimony concerning the biochemistry of iron absorption and treatment would have been more comprehensive than that of the other Government experts and was, therefore, at least partially non-cumulative. Dr. Rauber had different, and arguably better qualifications than the other experts.

■ Our review of the record leads us to the conclusion that the Government should be able to submit the testimony of Dr. Rauber to the court. Liability in this case turns on a proper analysis of highly technical material and the highest qualified expert should be available to the court. Inasmuch as this is a trial without a jury, no new presentation of the other evidence before the court need be made, but the court must reconsider all of the evidence in light of Dr. Rauber's testimony, and reconsider its decision as to liability.

Although the case is remanded for further evidentiary proceedings and reconsideration of liability, it is appropriate for this Court to rule upon the other issues raised on appeal for guidance to the district court on remand.

## II. *Damages*

■ Although the judgment for $2,000,000 is vacated because of the problems at the liability stage, this Court would have vacated the judgment as excessive in any event. Plaintiffs contend the Government is foreclosed from challenging the amount of damages on appeal because it was not challenged in the motion for new trial.

Where, as here, damages are set by the judge instead of a jury, issues raised during trial and ruled on by the trial court need not be raised again in a motion for new trial in order to preserve them for review on appeal. *United States v. Harue Hayashi*, 282 F.2d 599, 601 (9th Cir.1960). The district court awarded each parent $1 million for "future loss of support and services [and for] past and future mental pain and suffering for the duration of their respective lives."

This Circuit has held that the "components and measure of damages in FTCA claims are taken from the law of the state where the tort occurred...." *Harden v. United States*, 688 F.2d 1025, 1029 (5th Cir. Unit B 1982) (quoting *Ferrero v. United States*, 603 F.2d 510, 512 (5th Cir.1979)); 28 U.S.C.A. § 2674. Under Florida law, Fla. Stat.Ann. §§ 768.21(1) and (4), the parents of a deceased minor child may recover as follows:

(1) Each survivor may recover the value of lost support and services from the date of the decedent's injury to his death, with interest, and future loss of support and services from the date of death and reduced to present value. In evaluating loss of support and services, the survivor's relationship to the decedent, the amount of the decedent's probable net income available for distribution to the particular survivor, and the replacement value of the decedent's services to the survivor may be considered. In computing the duration of future losses, the joint life expectancies of the survivor and the decedent and the period of minority, in the case of healthy minor children, may be considered....

(4) Each parent of a deceased minor child may also recover for mental pain and suffering from the date of injury.

The predecessor statute to this statute was Fla.Stat.Ann. § 768.03 (1963), repealed in 1972, which stated in pertinent part: "[T]he father of such minor child, or if the father be not living, the mother may maintain an action ... and may recover, not only for the loss of services of such minor child, but in addition thereto, such sum for the mental pain and suffering of the parent (or both parents) if they survive, as the jury may access." Case law interpreting the predecessor statute has been held applicable to cases arising under the new damages statute. *Smyer v. Gaines*, 332 So.2d 655, 659 (Fla. 1st DCA 1976).

Florida appellate courts rely heavily on the damages awarded by juries in similar cases. In *Gresham v. Courson*, 177 So.2d 33 (Fla. 1st DCA 1965), the Florida appellate court reduced the jury damage award to a father for the death of his eleven-month-old son (1) for lack of evidence upon which to predicate the high damages, and (2) because the award was very high compared to the "trend" in the jurisdiction. The court said:

[T]he appellate courts have been and always will be unable to devise a measure or scale by which to fix with mathematical certainty the minimum and maximum limits of the verdict which a jury may lawfully return in the suit of a surviving parent for the wrongful death of his child under the facts and circumstances peculiar to a particular case. In appeals testing the amount of the verdict and judgment there is no better criterion available than as stated by Mr. Justice Terrell in Florida Dairies Co. v. Rogers, supra, and it must of necessity be applied here. In that context, if the verdict and resulting judgment do not bear a reasonable relation to the philosophy and general trend of prior decisions in such cases, the judgment must be either set aside and a new trial awarded or a remittitur imposed reducing it to an amount which the appellate court in the exercise of its discretionary powers and in good conscience deems sustainable.

*Id.* at 39–40. The court had previously noted what Mr. Justice Terrell said in *Florida Dairies Co. v. Rogers*, 119 Fla. 451, 161 So. 85, 88 (1935), as follows:

In cases where damages for mental pain and suffering are allowed, it must bear some reasonable relation to the facts, the status of the parties, the

amount allowed as compensatory damages, and the philosophy and general trend of decisions effecting such cases. When we say that the amount allowed must bear some reasonable relation to such factors, we do not mean that it must be equal to, be twice these, or bear any other arbitrary relation to them, but what we do mean is that these and other cognate factors are proper elements on which the allowance may be predicated. It cannot be predicated on the basis of restitution.

177 So.2d at 37–38.

■ In this case, a mortality table and the parents' testimony were offered as evidence of damages, and nothing more. There is nothing in this record to show the base upon which this large judgment rests. There was no evidence regarding the value of services or support. *Gresham* said that "unless the deceased child had some extraordinary income-producing attributes, the cost of maintaining it to maturity would normally exceed the value of any services which might likely be rendered by the child to the parent." *Id.* at 37. It seems quite apparent that the award here must be restricted to mental pain and suffering.

In showing excessiveness, the party challenging damages may show that the amount is unsupported by the evidence. *Bould v. Touchette*, 349 So.2d 1181, 1184 (Fla.1977). A verdict must be set aside if it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the trier of fact may properly operate.

Although excessiveness may be tested by comparing the verdict to those damage awards determined not to be excessive in similar cases, *Sanders v. Nabisco, Inc.*, 359 So.2d 46 (Fla. 1st DCA 1978); *Loftin v. Wilson*, 67 So.2d 185 (Fla.1953), we have been unable to find any reported case in Florida with an award this high. Perhaps some research or compilation of similar cases tried in Florida is available that could be submitted to the court and could thus be made a part of the record to furnish a basis for the amount that should ultimately be awarded.

Nothing has been presented to us, however, and there is nothing in the record before the district court to justify the amount of damages awarded in this case. A plaintiff has the burden of justifying the amount of damages that can be awarded even though the loss of an infant child can be so devastating that monetary damages are incalculable. The determination of liability was a close call, at best, and there is no base upon which to permit any punitive consideration to become involved in a damage award. In any event, the FTCA specifically prohibits an award of punitive damages. Courts should guard against punitive and emotional considerations influencing awards of damages under the FTCA. If liability is found on remand, the district court should conduct a further hearing on damages and set a damage award consistent with the opinion.

Several other evidentiary issues were raised on appeal. We affirm the district court's ruling in each instance, with the following point-by-point discussion.

### III. Exclusion of The Risk Management Report

■ The district court excluded from evidence a "risk management report" prepared by an insurance adjuster on behalf of Jackson Memorial under its statutory duty to maintain such a report, Fla.Stat.Ann. § 768.41(1)(d). The report was prepared November 20, 1980, eighteen days after the child's death, and contained, among other things, informal physicians' opinions. In argument over the correctness of the district court's ruling, neither party has noted that the statute which requires the preparation of the risk management report specifically provides that those reports are not admissible in evidence:

The incident reports shall be considered to be part of the work papers of the attorney defending the establishment in litigation relating thereto and shall be subject to discovery, but not be admissible as evidence in court....

Internal Risk Management Statute, Fla. Stat.Ann. § 768.41(4).

Florida has thus made a legislative judgment that in order to insure the reliability and efficacy of the required reports, they should not be subject to use in litigation. *See also Palmer v. Hoffman,* 318 U.S. 109, 113, 63 S.Ct. 477, 87 L.Ed. 645 (1943). Although not controlling in federal litigation where the Federal Rules of Evidence apply, the statute undergirds the decision of the trial court. After reading the document, the district court found that it was not admissible under either the business records or public records exception to the hearsay rule, Fed.R.Evid. 803(6) and (8).

Given the circumstances under which the report was prepared and the inclusion in it of non-contemporaneous unofficial statements, when viewed in the context of the above cited statute, it was within the district court's discretion to exclude the report from evidence.

### IV. *Exclusion of Letter From Counsel to Expert*

■ The district court excluded a letter sent by plaintiffs' counsel, Mr. Cole, to Dr. Holzman, an employee at Jackson Memorial. Plaintiffs assert Dr. Holzman was a potential plaintiffs' expert witness and that the letter was written to him in that capacity. In the letter, Cole stated that "the child consumed 30 to 50" iron pills, that the bottle of pills was purchased "approximately October 25, 1980," and that plaintiffs discovered the ingestion at 7:00 a.m. on November 2, 1980. The letter, bearing on the number of pills ingested and the swiftness of the parents' response, is relevant to the issue of fault. After reading the letter and hearing argument concerning its admissibility, the district court permitted its use for purposes of impeachment, but would not admit it into evidence for the truth of the matter stated.

Defendant, asserting that the exclusion constitutes reversible error, views the letter as an admission against interest by the authorized agent of a party opponent, Mrs. Johnson. According to plaintiffs, however, Cole had never met or spoken with Mrs.

Johnson at the time the letter was written and the letter was protected under the attorney work product rule. It is apparent that any possible error arising from exclusion of the letter, if error at all, was harmless. *First,* the letter and its essential contents were used for impeachment. *Second,* the trial judge, here the trier of fact, examined the letter.

### V. *No Exclusion of Mrs. Johnson*

■ Reiterating an argument raised and rejected in pre-trial motions, the Government contends Mrs. Johnson is not a proper party and that the district court therefore erred in refusing to exclude her from the courtroom during trial under Fed.R.Evid. 615.

Under the Florida Wrongful Death Statute, survivors or parents of deceased minor children are not explicitly excluded from joining as parties. Fla.Stat.Ann. §§ 768.16–768.27. Mr. and Mrs. Johnson were both individually listed on the complaint as parties and were awarded damages in their individual capacities. The district court did not err in allowing Mrs. Johnson to remain in the courtroom during trial.

### VI. *Trial Judge's "Outside Research"*

This case involved extended and complex medical and scientific testimony on the nature of iron poisoning. The appropriate treatment, survival rates, and etiology are a matter of dispute in the medical community. The trial judge, apparently in order to familiarize himself with the subject matter and to put technical testimony into context, consulted medical journals not in evidence prior to hearing the expert testimony. On at least two occasions his questioning of expert witnesses referred to the journals or reflected his familiarity with the literature.

On appeal the Government alleges the trial court abused its discretion in denying a new trial because the "outside research" deprived it of the right to trial by an impartial factfinder and to challenge adverse facts made known to the factfinder. The trial judge denied the motion for a new trial because (1) the Government had failed

to object during the trial, (2) he did not rely on those "outside sources," and (3) any error was harmless.

It is a matter of common knowledge that courts occasionally consult sources not in evidence, ranging anywhere from dictionaries to medical treatises. *See, e.g., Roe v. Wade,* 410 U.S. 113, 129–162, 93 S.Ct. 705, 715–731, 35 L.Ed.2d 147 (1973). A trial judge's findings are not necessarily tainted simply because he brings his "experience and knowledge to bear in assessing the evidence submitted at trial." *Hersch v. United States,* 719 F.2d 873, 879 (6th Cir. 1983). The trial judge may not, however, undertake an independent mission of finding facts "outside the record of a bench trial over which he [presides]." *Price Brothers Co. v. Philadelphia Gear Corp.,* 629 F.2d 444, 447 (6th Cir.1980).

■ It was obvious at trial that the trial judge had done "outside research." The Government's failure to object during trial constitutes procedural default. In any event, the trial judge stated he did not rely on those outside sources in reaching his conclusions and this appellate court relies on those representations.

### VII. *Taxing of Costs*

On March 5, 1984, the Clerk of Court for the Southern District of Florida, pursuant to 28 U.S.C.A. § 1920, taxed the Government $14,238.90 for plaintiffs' costs under Fed.R.Civ.P. 54(d), which provides that "[o]n motion served within 5 days thereafter, the action of the Clerk may be reviewed by the court." The Government, which prior to March 5th had prematurely filed itemized objections, filed a "Motion to Vacate Clerk's Award of Costs and Memorandum" on March 8, 1984, incorporating its previous itemized objections, wherein it asked the court to "vacate the Clerk's award of costs pending a ruling on defendant's objections to the items of cost sought by plaintiffs."

■ This record does not indicate that the district court has ruled on the Government's March 8, 1984, Motion to Vacate.

We are, therefore, without jurisdiction to entertain an appeal on the issue of costs at this time. Upon remand, the district court will have an opportunity to rule on the cost issue.

### VIII. *Attorney's Fees Under FTCA*

After the district court awarded $2 million in damages to the plaintiffs, the plaintiffs filed a petition for attorney's fees. The court, asserting discretion under the Equal Access to Justice Act (EAJA), 28 U.S.C.A. § 2412(b), declined to make a specific fee award, indicating that the $2 million in damages was intended to include attorney's fees: "Plaintiffs' recovery [is] adequate to allow for the payment of attorneys' fees from that recovery, not to exceed the statutory limit of 25% of the Final Judgment."

■ In Florida, a prevailing party in a medical malpractice suit is, by statute, entitled to attorney's fees. Fla.Stat.Ann. § 768.56. This Circuit, however, recently held that the Florida medical malpractice attorney's fee provision does not entitle prevailing parties to a fee award against the United States under either the Federal Torts Claims Act or under the Equal Access to Justice Act (EAJA). *Joe v. United States,* 772 F.2d 1535, 1536 (11th Cir.1985).

The Court in *Joe* found nothing in either the FTCA or the EAJA to indicate that courts should diverge from the " 'American rule' " which "refers to the tradition in the United States that litigants must bear their own attorney's fees." *Id.* at 1537. The district court, therefore, had no authority to separately award attorney's fees against the United States and should not have included in its damage judgment any amount "for the payment of attorney's fees." Thus, the denial of a separate judgment for fees is affirmed. Although we have already reviewed the excessiveness of the damage award, it would in any event have to be reconsidered because the district court included in it an amount for attorney's fees.

VACATED and REMANDED.

**KRAVITCH, Circuit Judge,** specially concurring:

Although concurring in the result, I would admit in evidence the letter from Mr. Cole to Dr. Holzman as an admission against interest by the authorized agent of a party. Rule 801(D)(2)(D), Federal Rules of Evidence. The letter in question was written by one of plaintiff's counsel of record during the course and within the scope of his authority as counsel. The plaintiff contends that the Rule does not apply because the attorney had never, at that time, spoken to Mrs. Johnson. I see no merit to this argument.

The plaintiff also contends that the letter is privileged as being the work product of the lawyer. While the document in question was prepared by the lawyer in anticipation of litigation, I do not believe it to contain privileged information, nor was it a work product as contemplated by the Rules.