Ivan E. GRAYSON, as personal representative of the Estate of Hae Yon Sin Grayson (wife), Ivan E. Grayson, as personal representative of the Estate of Akilah Kyong Hae Grayson (daughter), Ivan E. Grayson, as personal representative of the Estate of Marcia Ji Hae Grayson (daughter), and Ivan E. Grayson, individually, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 89–10041–Civ.

United States District Court, S.D. Florida.

Sept. 27, 1990.

Ira Leesfield, Miami, Fla., for plaintiff.

Allan Dagen, Asst. U.S. Atty., Fort Lauderdale, Fla., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW [1]

JAMES LAWRENCE KING, Chief Judge.

Hae Yon Sin Grayson and her two small daughters perished in the early morning

---

**1.** These three wrongful death actions were brought by the plaintiff, as Personal Representative of the three estates of his deceased wife and two minor daughters, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), 2671 *et seq.* The case was tried to the court without

hours of August 29, 1987, when their car sank in the deep waters surrounding Navy Pier D–3, in Key West, Florida. Ivan Grayson, tormented by the mind numbing horror of the tragedy that wiped his family from the face of the earth, desperately needs to know why this happened.

### Responsibility for the Tragedy

Hae Grayson, the 32–year–old wife of serviceman Ivan Grayson, had gone fishing with her two daughters on Pier D–3 at Trumbo Point Naval Base in Key West, Florida, in the recreational area provided by the Navy for the use of Navy personnel and their dependents. She had gone with other Navy dependents, wives and children, on prior evening fishing excursions to the same pier. The Navy welcomed its 6,500 service personnel and dependents to use the recreational facilities of Pier D–3, and her presence upon the pier on the evening of August 29, 1987, was with the knowledge and consent of the United States Navy and its employees. (stipulated). It was not unusual or uncommon for the substantial contingent of Navy personnel and their dependents to use the pier for recreational fishing just as Mrs. Grayson was using the facility on the evening in question. The base commander testified he and his son used the pier for recreational fishing, and that he was aware that base personnel and their families fished, on a regular basis, from the pier.

For Navy dependents intending to use the pier, it was customary for them to enter through the main gate, drive across the base, and out onto the pier where they would park their cars as Mrs. Grayson did this evening.

The pier was built by the P & O Steamship Company in approximately 1902. The portion of the pier on which persons could drive was approximately 900 feet in length and 60 feet in width. The pier was considerably more narrow near the gate. On this particular evening, the area surrounding the gate to Pier D–3 was not illuminated.

(stipulated). The roadway on the northeast side of the pier ended at a perpendicular angle to the exit gate through which Mrs. Grayson would have had to pass when leaving the pier. (stipulated). The roadway near the exit gate did not have any markings, signs or other provisions to alert civilian traffic of the end of the roadway. (stipulated).

Although Pier D–3 was used as a recreational facility for military personnel and their families, it was not open to the general civilian (non-military) population of Key West.

Immediately following the drowning deaths of the Grayson family, the commanding officer of the base, Captain William Denning, pursuant to Judge Advocate General (JAG) Manual requirements, ordered Lt. Commander Ciarula to investigate the tragedy and determine the fault, neglect or responsibility therefore.

Lt. Commander Ciarula conducted a full investigation into the drowning deaths of the Grayson family. He found the contributing causes of the accident to be: (1) Mrs. Grayson's vision problem; (2) Mrs. Grayson "was probably very fatigued"; (3) Mrs. Grayson's limited driving experience; (4) "The way the road narrows to the gate with the gate on the far right side but no lane markers or guard rails"; (5) "The only light ... does not light up the gate, fence or where the pier narrows."

Ciarula noted, *"Because the gate area and the end of the pier was not well lighted or marked,* she did not realize that she was heading for the edge of the pier."

Commanding Officer Denning disapproved of the underlined portion of Ciarula's opinion (above). Captain Denning also disapproved of the finding that Mrs. Grayson's peripheral vision was a contributing cause of the accident.

Ciarula made three recommendations in the JAG Report: (1) barricade the end of

---

jury on September 10th–13th, 1990. The court announced, in open court, on September 13th, at the conclusion of final oral argument, its decision that the defendant was liable for the death of the wife and minor children. The court's decision on the amount of damages to be awarded to the plaintiff and the filing of this opinion were deferred in order to give the court time to carefully consider and render this decision.

the pier; (2) paint a traffic lane stripe on the pier to mark the limits of the gate; (3) light up the pier surface. Denning disapproved recommendation #2, pending a safety review.

All other findings of fact, opinions, and recommendations were approved by Captain Denning. In a memo to the Judge Advocate General, Rear Admiral Chase concurred in the findings of·fact, opinions, and recommendations as endorsed by Captain Denning.

The court finds his report to be factual, accurate and trustworthy. The Lt. Commander, as well as Captain Denning and Rear Admiral Chase, were duly qualified to investigate and render opinions on the causes of these deaths.

Prior to and on August 29, 1987, the Navy, through its employees, had undertaken to provide illumination on Pier D–3. A light pole had been installed by the government in the area of the exit gate. (stipulated). However, on the night of the accident the direction of the light had been turned to shine in a direction away from the exit area, thus providing no illumination in that area. (stipulated). Prior to the deaths, it was feasible to turn this light toward the exit gate and thereby illuminate the exit gate area. (stipulated). In fact, the reason for the light being placed there by defendant originally had been to illuminate the exit gate for drivers using the pier at night.

On August 29, 1987, the conditions of the pier at the exit area were confusing and deceptive. Without proper illumination, reflectorization, roadway markings, and guardrails, the pier constituted a virtual trap for nighttime vehicular traffic exiting the pier. Because the gate area at the end of the pier was not well lighted or marked, Mrs. Grayson was unable to perceive and react to the illusion caused by the narrowing of the pier at the exit.

This court finds that the deaths of Mrs. Grayson and her two children were caused by the following:

The lack of illumination in the exit area of Pier D–3;

Lack of guardrails, reflectors, and roadway markings;

The dangerous and confusing design and environment created by the Navy on the pier at the exit area;

The inadequate maintenance of the pier and adjoining Navy property;

The violation of civil engineering standards for design, marking and lighting the facility;

The violation of Navy standards and recognized U.S. Government standards applicable to the design, lighting, and signalization of the pier.

This court finds that neither speed, other vehicles, traffic conditions, mechanical condition of the Grayson vehicle, drugs, alcohol, or seat belts contributed to causing this accident. Mrs. Grayson's own actions did not contribute to the occurrence of this accident. The actions of the three-year-old and eighteen-month-old children were obviously equally non-contributory.

Prior to the accident, it was both feasible and simple for the defendant to have installed roadway markings, guardrails, proper illumination, and poles on and around the northeast end of the pier to alert vehicles of the termination of the roadway so as to prevent cars from going over the edge of the pier. The Safety and Health Officer for Key West Naval Base, Mr. Alvin Wilson, whose responsibility was to inspect Pier D–3 and other Naval facilities in the Key West area to insure the safety of military personnel and their families, testified that the cost of the installation of such safety features was not a factor that precluded the installation of such safety devices.

As she drove east toward the exit, Hae Grayson headed toward the only visual reference she had, the streetlight at the turn. The seat belts of Mrs. Grayson and her children were fastened when the car was hauled out of the ocean. One must conclude, logically, that she buckled her babies into their seats and fastened her own seat belt before driving down the pier toward what she thought was the exit. Deceived by the abrupt ending of the unmarked, unlit roadway, her vehicle drove over a low,

unpainted eight-inch curb on the edge of the pier. Her vehicle entered an unpaved, unmarked, poorly maintained area consisting of grass and gravel and onto a small seawall adjoining the exit gateway. The seawall catapulted her Hyundai automobile, upside down, into the ocean.

During the early morning hours of August 29, 1987, Ivan was summoned to Pier D–3 by his commanding officer. There, he saw the recovered bodies of his wife and three-year-old daughter, Marcia.

The strong current of Fleming Cut had ripped his younger daughter, Akilah, from her car seat, and her missing body was not discovered until two days later floating in the Gulf waters off Key West. When Ivan Grayson was required to identify the bodies of each member of his family at the morgue he observed the mutilation of the tiny body of his child caused by fish.

The United States Navy has published design manuals, set standards and established regulations governing the design, construction and maintenance of roads and piers. The defendant's engineers, public works officers and employees must comply with these standards, as well as ANSI, AASHTO and IES standards in maintaining roadways, piers, pavement workings, and roadway illumination.

Government design manuals, specifically DM 5.5 and 4.4, required the Navy to install guardrails, provide pavement markings and adequate lighting on Pier D–3. The government's failure to provide guardrails, roadway markings and adequate illumination on Pier D–3 violated its own established safety practices, policies and procedures. Tragically, the failure to follow these standards was the cause of these multiple deaths.

Dr. William Fogarty is a civil engineer with 32 years of practice. He has conducted numerous studies for the benefit of the United States government on safety practices and standards for roadways and is an expert in accident reconstruction. The court finds his testimony to be clear, logical and worthy of belief regarding the causes of the subject accident. Dr. Fogarty testified that the deaths were caused by the Navy's failure to follow their own standards and safety practices of designing and marking their pier, and failing to provide guardrails, signs, reflectors, illumination or any warning to the deceased of a design hazard. He further testified that the design and lighting of this pier created an optical illusion deceiving the deceased.

Mr. Sidney Herndon is a licensed electrical engineer, director of lighting design for a private firm and an expert on lighting design and illumination. He is a past president of the Illumination Engineering Society and designed the television lighting system for NASA's space shuttle. Mr. Herndon testified as an expert and rendered an opinion that improper lighting, coupled with the defendant's failure to follow both recognized lighting standards and its own standards (as outlined in their design manuals) caused this accident. The ambient lighting conditions created an optical illusion deceiving Mrs. Grayson as she drove off the pier.

### The Government's Defense

The government has asserted two primary defenses: (1) that the duty the defendant owed to Mrs. Grayson and her children was met; and (2) that, in any event, the accident occurred through no fault of the government, as a fishing pole became lodged in the steering wheel of the Graysons' car, thereby causing the accident.

### The Duty of Care

The plaintiff asserts that the government breached its duty of reasonable care to the decedents. The government argues that it did not owe a duty of reasonable care, but that it owed a lesser duty, which it fulfilled. In Florida, a landowner or occupier of land owes different duties of care to different classes of persons who enter the premises. The government asserts that it merely owed the same duty to the decedents as that owing to an uninvited licensee. That is, the landowner must not intentionally expose the uninvited licensee to harm and must warn of dangers known to landowner when such dangers are not open to ordinary observation. *Wood v. Camp,* 284 So.2d 691, 695 (Fla.1973); *Hix v. Bil-*

*len*, 284 So.2d 209, 210 (Fla.1973). The plaintiff, on the other hand, argues that the government owed, and breached, its duty of reasonable care under the circumstances. The duty of reasonable care is that duty owed to what is commonly referred to as an invitee.

In *Post v. Lunney*, 261 So.2d 146, 148–49 (Fla.1972), the Florida Supreme Court stated that an invitee is either a public invitee or business visitor. A public invitee is a person who is invited to enter or remain on land for a purpose for which the land is held open to the public. *Id.* at 148. A business visitor is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with the business of the landowner. *Id.* In *Wood v. Camp*, 284 So.2d 691, 695 (Fla.1973), the Florida Supreme Court expanded the definition of invitee "to include those who are 'licensees by invitation' of the property owner, whether by express or reasonably implied invitation." The court explained that the traditional distinctions among business invitees, public invitees, and licensees by invitation were no longer valid, and all three classes are invited visitors who are owed a duty of reasonable care under the circumstances. *Id.* at 694–95.

The court in *Wood* also made clear that distinctions still remain between an invitee and an uninvited licensee and between the duty each is owed. *Id.* at 695. *Wood* defined uninvited licensees as persons who choose to come upon the premises solely for their own convenience without an invitation either expressed or reasonably implied under the circumstances. *Id.*

█ The government has argued that Mrs. Grayson and her two young children were merely owed the duty required for an uninvited licensee. The court finds, however, that Mrs. Grayson and her children were more than uninvited licensees.

Given the facts surrounding the use of Pier D–3 and the other nonrestricted facilities at the Naval Air Station in Key West, this court finds that Navy personnel and their dependents—including Mrs. Grayson and her children—were invited, either expressly or by reasonable implication, to use these facilities. Testimony presented at trial revealed that approximately 6,500 military personnel and dependents were permitted and, in fact, welcomed to use all of the nonrestricted facilities at the Naval Air Station in Key West, Florida. Moreover, both Navy personnel and their dependents knew that the base facilities had been opened to them and, as a result, the facilities (including Pier D–3) were widely used. In particular, it was well known that the use of Pier D–3 for recreational fishing purposes had been extended to Navy personnel and their dependents. Captain Denning, the base commander, knew and approved of this use; in fact, both he and his son had used Pier D–3 for fishing purposes.

█ Clearly, Mrs. Grayson and her children were impliedly invited to use the base facilities and Pier D–3. Under *Wood v. Camp*, Mrs. Grayson and her children were licensees by invitation, if not members of a more traditional "invitee" class. The government therefore owed the Graysons a duty to use reasonable care under the circumstances. The defendant failed to maintain Pier D–3 in a safe condition for vehicular traffic. The defendant therefore violated the standard of care owed to the Graysons.

### The "Fishing Pole" Defense

█ The government has presented a defense in which it has asserted that the accident in this case occurred due to a fishing pole that was lodged in the steering wheel of Mrs. Grayson's Hyundai. The government contends that this fishing pole was the sole cause of the accident because it prevented Mrs. Grayson from steering her vehicle. The court finds this theory, at best, unconvincing.

The government's expert witness, Mr. Bynum, developed this "fishing pole" theory from a photograph taken of the Graysons' vehicle. The photograph, which depicted a fishing pole lodged in the steering wheel of the Graysons' vehicle, was taken after the accident had occurred and after the vehicle had been removed from the

ocean. Before the photograph was taken, however, the car had plummeted off the pier, turned over, and sunk into the ocean. While in the water, the car was subjected to a strong current. In fact, the current was strong enough to carry the youngest Grayson child out of the vehicle and out to sea. Finally, thousands of gallons of sea water poured out of the car as the cables and winches dragged it, upside down, from the ocean and dumped it in an overturned position on the pier.

A photograph taken of the interior of the car, after all this had transpired, can hardly be given any credence when offered to prove the defendant's theory that Mrs. Grayson (or someone unknown) jammed the fishing pole in the steering wheel *before* the accident. Moreover, even assuming that a fishing pole had been jammed in the steering wheel of the vehicle before the accident, the government's theory fails to explain how Mrs. Grayson could possibly have driven a distance of approximately 150 feet before plunging to her death. Obviously, if a pole had indeed been lodged in her steering wheel, she could not have steered the car at all, and it would have swerved off the pier before driving 150 feet.

The government also failed to provide a logical, believable explanation as to why the fishing pole would have been lodged in the steering wheel. If Mrs. Grayson had intended to commit suicide, taking her children with her, she certainly would not have carefully buckled her children into their seats and put away her ice chest. There is not a scintilla of evidence supporting motivation for suicide. Why would Mrs. Grayson have driven a distance of approximately 150 feet before driving off the pier? A suicidal purpose simply fails as an explanation for the events that transpired. An explanation suggesting that one of the two young children could have moved and lodged a large fishing pole into the steering wheel is even more unlikely.

Finally, the timing of the government's adoption of this theory illustrates that the theory is neither logical nor believable. It was not until the eve of trial that the government's expert, Mr. Bynum, or the government, embraced the theory that the fishing pole caused the accident. Mr. Bynum had been deposed on two prior occasions, one such deposition was taken only a few weeks before trial. Although testifying extensively regarding his opinion of what caused the accident during both depositions, he did not mention one word about the fishing pole causing the accident until he testified in court. Had the theory been even remotely plausible, the government would surely have considered it, at a minimum, sometime prior to the eve of trial. In short, the court finds this theory and its evidentiary support to be wholly unconvincing.

### Damages

The court, having found liability on the part of the defendant must come to grips with the most difficult of judicial chores; awarding damages for the tragic loss of loved ones. Ivan Grayson lost his entire family in this horrible, tragic occurrence. For that, there is no amount of monetary compensation that can ever put things right again.

### Ivan

Ivan Grayson, a career Navy Serviceman, always loved children. He grew up in Chester, Pennsylvania where his mother, Edith Grayson, is pastor of the Star AME Church. The testimony reflects that he was a bright, intelligent boy, who was encouraged by his mother to seek a career in the United States Navy. Perhaps because of this family background with a history of charitable involvement with people in the church and community, he volunteered to sponsor an orphan child, by regular financial contributions from his seaman's pay. While stationed at overseas posts in Korea, Japan and Germany, he further demonstrated his love of children by involving himself with orphanages that needed the off-duty time of caring individuals to play with children, take them on field trips, teach them games, and give them love. Part of this grew out of his involvement with International Big Brothers.

Ivan and Hae met, and were married, in Korea. Hae, very proud to be the wife of

an American serviceman and desirous of becoming an American citizen, came back to live with her mother-in-law, Pastor Edith Grayson, in Chester, Pennsylvania, where she awaited the birth of their first child, Marcia Grayson. Hae had always shared her husband's caring concern for the poor and unfortunate. A very religious young woman, she brought a number of Korean refugees into Pastor Grayson's home to be fed, helped and cared for.

After the birth of Marcia, Hae joined her husband on assignment in Germany. Ivan's happiness was complete, he had his own family and his own child. The testimony reflects he was a loving, caring father and husband. During intervals between assignments, he would bring his family back to his mother's home in Pennsylvania, and she had an opportunity to observe them together.

Pastor Edith Grayson testified that her son died the day his family died. She was with him shortly after the nightmare tragedy when Ivan saw, and identified, the bodies of Hae, Marcia, and his mutilated baby, Akilah. She saw him take his wife's wedding ring and force it on his finger. She testified as to how he keeps pictures of his wife and babies all around his living quarters, how he kept the baby seat set up ready for use in his car, how he works three jobs so as to have no free time to think about his family, and how he speaks of his family as though they are still alive. He not only kept all of his wife's things, including her hair brush and other personal toiletry articles as she left them on that last fateful day, but for many months he kept running home from work to check on his family and make sure they were alright.

Dr. Larry Platt, a Ph.D. from Harvard and the author of four books and numerous articles in scientific journals on thanatology, the study of death and dying, lectures as a full professor at Southern Georgia University. According to Dr. Platt's testimony, Ivan's grief will never end.

This recognized expert in the field of coping with death and dying testified that Ivan obviously lost the most important people in his life on the night of August 29, 1987. By the sudden and unexpected death of his spouse, he lost his present life. By the equally sudden and unexpected loss of his only two children, he lost his future. This type of tragedy is the most intense and lasting grief known to man, and the suffering of the surviving husband and father is intense and permanent. Ivan will, in time, come to cope with the situation, but it will never go away. Ivan has no support system left; he has no spouse to help him share the grief of the death of his children and no children to help him with love, affection and sharing to help with the death of the spouse. Ivan is dominated by avoidance of the tragedy and attempts in every way to wall it out of his mind in his search for his semblance of peace. This is a reason he stays as busy as he can and holds as many different jobs as he can.

Conversely, he has a lasting feeling of attachment. For example, he visits the family's grave, where he talks to them as if they are still alive and with him. He maintains the pictures, the hair brushes and personal articles of his deceased spouse and children as something that draws him back to his dead family. Hae's clothes and the fragrance of the perfume she wore are kept as an attempt to cling to his lost family.

Dr. Platt testified that Ivan suffers from separation anxiety, a term that is used to describe the fear that a person must endure when a tragedy such as this befalls him. This is the fear that some catastrophic event will happen again in his life to destroy him all over again.

Ivan Grayson was born on September 6, 1960. His life expectancy is 39.4 years. His wife, Hae, was born on June 26, 1955. At the time of her death, she was 32 years old with a life expectancy of 45.2 years. Marcia Grayson was born January 1, 1984. At the time of her death, she was three years old with a life expectancy of 73.2 years. Akilah Grayson was born on November 11, 1985. At the time of her death, she was 18 months old with a life expectancy of 75.1 years. As set forth above, Ivan

Grayson had a stable, warm and fulfilling family life with his wife and two children.

At the time of her death, Hae Grayson provided companionship, support and services to Ivan Grayson. In addition to working in the home, she worked as a hostess at Benihana of Tokyo, earning $4.50 an hour. Before her death, her employer was considering her for promotion to a position as a waitress, where she would have earned between $11,000 and $15,000 a year.

Dr. Larry Platt testified concerning the magnitude of Ivan Grayson's grief and suffering in losing all three members of his family at one time. It is unrefuted that Ivan Grayson's grief and pain over the loss of his family has been intensified by the fact that the deaths of his wife and children were untimely, avoidable, and left Ivan with no other survivors in his family. The mutilation of the body of his baby was an incredible shock and a continuing part of his pain.

Ivan Grayson suffers and will continue to suffer for the remaining years of his life for the deaths of each member of his family. As a result, he is depressed, emotionally disorganized, and confused.

Dr. David Williams is an economist and an expert on economic loss. He testified as an expert witness and gave an opinion that, reduced to present value, the total projected economic losses, including services to the household and earnings for Hae Grayson, are $569,916. He further testified that the projected net accumulations for the estates of Marcia Grayson and Akilah Grayson would be $97,378 per estate.

### Recovery for Loss of Children

■ The law of the state where the wrongful death occurred dictates the measure of damages and components in an action under the FTCA. *Johnson v. United States*, 780 F.2d 902 (11th Cir.1986). In this case, Fla.Stat. § 768.21 controls the damages plaintiff shall receive. This statute allows a parent of a deceased minor child to recover for lost support and services and for mental pain and suffering. However, in the case of the death of a young child, courts have interpreted the statute to permit a holding that the costs of providing for that child until maturity will be greater than the value of any services to be rendered by that child. *Williams v. United States*, 681 F.Supp. 763, 764 (N.D. Fla.1988); *Gresham v. Courson*, 177 So.2d 33, 37 (Fla. 1st DCA 1965). In this case, the award for the loss of plaintiff's two daughters, ages three years and eighteen months, will be limited to mental pain and suffering. *Johnson v. United States*, 780 F.2d 902, 908 (11th Cir.1986); *Williams*, 681 F.Supp. at 764.

■ Justice Terrell, speaking for the Florida Supreme Court in *Winner v. Sharp*, 43 So.2d 634 (Fla.1949), described a parent's pain over the loss of a child thusly:

> Those who have not brought a child into the world and live it and planned for it, and then have it suddenly snatched away from them and killed can hardly have an adequate idea of the mental pain and anguish that one undergoes from such a tragedy. No other affliction so tortures and wears down the physical and nervous system. Psychosomatic illness of a serious nature may follow. The emotions may be unstrung, the nerves put on edge and the end effect may be a period in a rest home, a mental hospital, serious physical derangement and sometimes death.

Mr. Grayson was a loving father to his two young daughters, and he care immeasurably for them. He loved all children in general, as evidenced by his involvement with helping youngsters in various organizations in various parts of the world. The court can only imagine how intense the pain and suffering will be for the plaintiff, who must endure it for the rest of his life.

The court finds the analysis of the *Williams* court to be of particular help in ascertaining the trend of damage awards. Chief Judge Stafford, in *Williams*, compiled similar Florida wrongful death actions involving deceased minor children. He determined an average award in Florida to be approximately $900,000 for a parent who suffered the loss of a young minor child. $1.8 million was then awarded,

$900,000 to each parent for the wrongful death of one child.

Following the teachings of *Johnson*, the court has carefully considered the analysis of the wrongful death cases set forth in the opinion in *Williams*. These are all Florida cases and pertinent to the consideration of this court. Additionally, the court relies on the list of nineteen wrongful death verdicts and settlements from courts in South Florida that were submitted by plaintiff. (Said list is attached to this opinion as Exhibit "A".) Four of the nineteen cases involve damages for the death of a child under ten years old. In these four cases, it appears that damages for a parent approximated $1 million for the wrongful death of a child.

■ Based on the above analysis and the facts in this case, the court concludes that a fair and just award, one in keeping with the trend in similar cases, is $850,000 for the death of each child. The total award for the deaths of the two daughters in $1.7 million.[2]

### Recovery for Loss of Wife

■ For the loss of his wife, Fla.Stat. § 768.21 allows Mr. Grayson to recover economic damages as well as for loss of companionship, pain, and suffering. He can also recover for future loss of support and services from the date of death reduced to present value and funeral expenses. § 768.21(1), (3). In evaluating the loss of support and services, the plaintiff's relationship to the decedent, the amount of the decedent's probable net income available for distribution to the plaintiff, and the replacement value of the decedent's services to the survivor may be considered. In computing the duration of future losses, the joint life expectancy of the survivor and the decedent may be considered. Plaintiff has asserted he has a life expectancy of 39.4 years. His wife's life expectancy was 45.2 years.

Dr. David Williams, plaintiff's economic expert witness, testified that the economic loss for Mrs. Grayson's death, over the rest of her 45–year life expectancy, would be $569,916. Included in this figure were lost wages and benefits of $333,340 for the thirty-two hours a week of restaurant work, and $335,500 for the full-time household and family services performed, minus consumables and reduced to present value.

The court finds that this amount should be reduced, and that a fair award for these economic losses is $250,000.

Section 768.21(2) entitles Mr. Grayson to recover for the loss of his wife's companionship, protection, and mental pain and suffering. The court has already discussed in the foregoing opinion the devastating impact this tragedy had on Ivan Grayson's life. Applying the *Johnson* analysis and considering all of the evidence in the case regarding Ivan Grayson's suffering surrounding the loss of his wife, the court concludes that a fair and just award in keeping with the trend in similar cases in this community for this element of damage is $1 million. Ivan Grayson shall be entitled to recover from the defendant the amount of $1,250,000 for the loss of his wife.

Accordingly, it is adjudged that Ivan E. Grayson, as personal representative of the Estate of Hae Yon Sin Grayson (wife), Ivan E. Grayson, as personal representative of the Estate of Akilah K. Yon Hae Grayson (daughter), Ivan E. Grayson, as personal representative of the Estate of Marcia Ji Hae Grayson (daughter), and Ivan E. Grayson, individually, shall recover from the defendant, United States of America, the sum of $2,950,000. Interest shall accrue at the current lawful rate from the date of this judgment.

DONE AND ORDERED.

### EXHIBIT A

### COMPARABLE WRONGFUL DEATH VERDICTS AND SETTLEMENTS SOUTH FLORIDA COURTS

1. *Georgiann DeCenzo, as Personal Representative of the Estate of Philip De-*

---

**2.** Mr. Grayson has also sought to recover for the loss of the net accumulations of his daughters' estates. However, since Ivan is the decedents' father, rather than spouse or lineal descendant, he is ineligible to recover for his daughters' lost accumulations. § 768.21(6)(a)(1).

*Cenzo vs. William G. Langton, David Mulligan, Paul Gilchrist, Lockheed Aircraft Corp., and Transamerica Airlines, Inc.*

Dade County, Florida, April 1990

Wrongful death claim of thirty year old co-pilot killed in airplane crash soon after take-off.

$10,142,612.00 verdict award ($7,342,-612 compensatory and $2,800,000 punitive awards). This is one of the largest, if not the largest verdicts for wrongful death in Dade County. (**Leesfield & Blackburn were trial counsel.)

2. *Robert Currie, as Personal Representative of the Estate of Michelle Curry, a deceased minor vs. Palm Beach County, The City of Delray Beach and Roger Richwagen*

Palm Beach County, Florida, January 30, 1989

Wrongful death of 16 year old who was a passenger on a motorcycle. Plaintiffs sued driver of motorcycle and the city and county for obstruction of view.

$1,925,000.00 verdict for plaintiff.

3. *Donald A. Askew, as Personal Representative of the Estate of David J. Askew, a minor, deceased vs. Saga Development Corporation, and Saga Bay Property Owners Association, Inc.*

Dade County, Florida

Plaintiff was a six year old retarded child who wandered away from his parents' home while they were washing the family van and drowned in the Saga Bay lake owned by the Saga Bay Property.

$1,300,000.00 verdict for plaintiffs.

4. *Marietta Goode, as Personal Representative of the Estate of Joel Goode vs. Walt Disney World Company, Columbia Casualty Company and Lloyds of London*

Orange County, Florida, March 1985

Wrongful death claim of four year old son who drowned in the moat surrounding Cinderella's castle at Walt Disney World.

Verdict for plaintiffs: $1,000,000 for mother; $1,000,000 for father.

5. *Annie Coffie vs. Etche Corporation, d/b/a Dixie Court Motel*

Dade County, Florida, June 1985

Wrongful death claim regarding six year old boy who drowned while a guest at the Dixie Court Motel.

$1,000,000 verdict for plaintiff.

6. *R. James Kaylor, as Personal Representative of the Estate of James R. Kaylor, a deceased minor vs. Ricardo Hermida, Des Roacher Sand Company, Frank DeLaurier, Home Insurance Company and State Farm Fire & Casualty Company*

Dade County, Florida, June 1983

Eight year old boy who died as a result of being buried by tons of sand which had been deposited on the property next to his parent's home.

$3,000,000 verdict for plaintiffs; $1.5 million for mother; $1.5 million for father.

7. *Bishop Hudson, as Personal Representative of the Estate of Sherry Hudson vs. Robert Thomas*

Broward County, Florida, October 1989

Wrongful death claim of survivor of decedent who was murdered at a motel. Inadequate security.

$2,331,400.00 verdict for plaintiff.

8. *Phyllis McCullers v. United States of America*

U.S. District Court, Southern District of Florida

Airplane crash—wrongful death.

$1,250,000 settlement award for plaintiff.

9. *Aurelio Santiago Carrera v. Allied Universal Corporation*

Dade County, Florida, November 1987

Wrongful death claim as a result of exposure to acid fumes. Decedent was employee of a pool supply company who was standing in the doorway of the business when a hose, connected to the defendant corporation's truck which was delivering muriatic acid, became detached.

$1,850,000 settlement award for plaintiff.

10. *Timonthy T. Barber, as Personal Representative of the Estate of Jill Barber vs. Mr. Martinez of Miami, Inc., and Nelio Hernandez*

Broward County, Florida, September, 1989

Decedent, at age 25, was killed when a dump truck backed over her while she was directing traffic at a construction site.

$2,000,000 verdict for plaintiff.

11. *Bruce W. Laubenheimer, Jr., as Personal Representative of the Estate of Lori K. Laubenheimer vs. Canteen Company and Cornelius Gallagher*

Brevard County, Florida, October 1989

Decedent, at age 28, was killed as a result of an automobile accident when a bus ran through a yellow and changing red light.

$2,989,709 verdict for plaintiff.

12. *Reinaldo Navarro, as Personal Representative of the Estate of Julia Navarro, etc., et. al., vs. Barbara Camejo, Flar, Inc., etc., et al.*

Dade County, Florida, September 1984

Automobile accident/wrongful death of 41 year old woman.

$3,600,000 verdict for plaintiffs.

13. *Vincent A. Griffith, et al., vs. Kenneth Craig Lockard, Yowell Transportation Service, Inc., National Car Rental System, Inc. and Land Lease*

Brevard County, Florida

Plaintiffs were injured and decedent (wife and mother) was killed as a result of a tractor-trailer skidded across roadway into the path of plaintiffs' vehicle.

Settlement before trial: $2,500,000 cash; $2,500,000 structured.

14. *Jill Coffta, an infant (minor), by and through Donald J. Coffta, legal guardian vs. Patricia Liles, as Personal Representative of the Estate of Orester Merrill Liles, All–State Vehicles, Inc., Professional Equipment Service, Inc., Insurance Company of North America,*

*and State of Florida Department of Transportation*

Charlotte County, Florida

Automobile accident—wrongful death claim. The Coffta family, including John and June Coffta, their minor surviving daughter, Jill, daughter Jennifer who was killed, grandmother, Joyce Betts, who was killed, and grandfather, Earl Betts, who was injured, were travelling south on State Road 45 in Port Charlotte. Case involved surviving daughter Jill's action for her own injuries and loss of her parents.

$1,685,000 settlement prior to trial.

15. *Orlando Dopico, as Personal Representative of the Estate of Pilar Dopico v. Raquel Cruz, M.D., P.A., Nidia Martin, M.D., Hugo Escalante, M.D., Hialeah Anesthesia Group—Torres & Escalante, P.A., Danae Mendez, M.D., and Simon, Pipes & Ross, P.A.*

Dade County, Florida, October 1987

Medical malpractice—wrongful death claim. Forty eight year old housewife died 26 days after being administered general anesthesia at Hialeah Hospital from mediastinitis that was demonstrated to have been caused by trauma to the pharynx during the process of intubation preceding the administration of anesthesia.

$1,086,516.85 verdict for plaintiff.

16. *Thomas Thasher v. (Names Withheld)*

Dade County, Florida, May 1988

Decedent, aged 48, bled to death during radical liver surgery to remove an asymptomatic liver tumor.

$3,000,000 settlement during trial.

17. *Smith v. Summit Venture*

Hillsborough County, Florida

47 year old registered nurse died as a result of drowning when her automobile plunged into Tampa Bay after the bridge was struck by the freighter, Summit Venture. Case was tried to a federal judge under general maritime law which limited damages to loss of support and services as well as loss of society.

$1,200,634.30 verdict for plaintiff.

18. *Queen Doyle Martin v. Francisco Bajandas, M.D. and North Miami General Hospital*
    Dade County, Florida, May 1983
    28 year old mother of two died during a Cesarean section as a result of alleged insertion by anesthesiologist of endotracheal tube into the esophagus.
    $1,300,000 settlement during trial.

19. *Eustaquio Gonzalez, as Personal Representative of the Estate of Concepcion Gonzalez v. Memorials, Inc., d/b/a Flagler Memorial Park*
    Dade County, Florida, 1986
    Premises liability/wrongful death. 65 year old woman suffered fractured hip as a result of a fall at a cemetery, and died 10 days later from pulmonary embolisms.
    $1,550,847 settlement prior to trial.