Loren DEMPSEY, a minor, suing By and Through her parents and natural guardians, Lonney DEMPSEY and Pansy Dempsey; Lonney Dempsey and Pansy Dempsey, individually, Plaintiffs–Appellees, Cross–Appellants,

v.

UNITED STATES of America, Defendant–Appellant, Cross–Appellee.

No. 92–2042.

United States Court of Appeals, Eleventh Circuit.

Sept. 8, 1994.

---

* Senior U.S. Circuit Judge John C. Godbold has elected to participate in further proceedings in this matter pursuant to 28 U.S.C. § 46(c).

Benjamin W. Beard, Asst. U.S. Atty., Pensacola, FL, William G. Cole, Edward R. Cohen, Appellate Staff, Civ. Div., Dept. of Justice, Washington, DC, for appellants.

James F. McKenzie, Pensacola, FL, for appellees.

Appeals from the United States District Court for the Northern District of Florida.

Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and JOHNSON, Senior Circuit Judge.

PER CURIAM:

I.

On February 27, 1988, Pansy Dempsey, wife of Lonney Dempsey, Sr., a retired en-

listee in the United States Air Force, gave birth to a baby girl at Eglin Air Force Base Hospital.[1] The child, Loren, was born with extreme breathing difficulties that, in conjunction with her doctors' negligent attempts at resuscitation, resulted in Loren's becoming severely retarded. On February 9, 1989, Lonney and Pansy Dempsey brought this Federal Tort Claims Act suit against the United States of America in the United States District Court for the Northern District of Florida. They claimed damages on behalf of Loren as well as compensation for themselves for the loss of the "society and affection of their child" and "for the loss of services of their child."

■■■ The magistrate judge to whom this case was assigned[2] held the Government liable for Loren's injuries and awarded $2.8 million to Loren for her medical expenses. The magistrate judge also awarded $1.3 million to Loren's parents for the "loss of society and affection of their child," but declined to award any damages to the parents for the loss of Loren's services. The Government appealed the magistrate judge's award to the parents for loss of society and affection, but did not contest liability or damages with respect to the award to Loren. Loren's parents cross-appealed the magistrate judge's denial of their claim for damages for the loss of Loren's services and also challenged the magistrate judge's decision to offset a portion of Loren's award for future medical expenses because the Government already is obligated to pay those costs under CHAMPUS, the Civilian Health and Medical Program of the Uniformed Services.[3] 10 U.S.C. § 1079 (1988).

Following oral argument on January 5, 1993, we determined that the resolution of two of the three issues on appeal turned on two unanswered questions of Florida law, while the third remained solely a question of federal law. In order to rule on the Florida law issues, we certified the following questions to the Supreme Court of Florida:

1. DOES FLORIDA LAW PERMIT PARENTS TO RECOVER FOR THE LOSS OF A CHILD'S COMPANIONSHIP AND SOCIETY WHEN THE CHILD IS SEVERELY INJURED?

2. DOES FLORIDA LAW PERMIT PARENTS TO RECOVER FOR THE LOSS OF THE SERVICES OF A SEVERELY INJURED CHILD ABSENT EVIDENCE OF EXTRAORDINARY INCOME–PRODUCING ABILITIES?

*Dempsey v. United States*, 989 F.2d 1134, 1135 (11th Cir.1993).[4]

■■■ The Florida Supreme Court has now answered both of the certified questions in the affirmative. *Dempsey v. United States*, 635 So.2d 961 (Fla.1994). In light of the opinion of that court, we affirm the mag-

---

1. Eglin Air Force Base is located in the Florida Panhandle.

2. By consent of the parties, the district court referred this case to a United States magistrate judge on March 14, 1989, to conduct all future proceedings and to render a final judgment binding on all parties. *See* 28 U.S.C. § 636(c) (1988).

3. The Dempsey's raise a third issue on appeal: that the magistrate judge erred in rejecting the "uncontroverted and logically based" expert present value testimony of their economist. We find no merit in this claim because here, unlike in the cases cited by the plaintiffs, the expert's testimony was not uncontradicted; rather, his present value testimony was questioned on cross-examination, and opposed by the presentation of contradictory testimony by the Government's expert. As such, the magistrate judge was well within her province in casting a critical eye to-

ward the testimony of plaintiffs' economist and in crediting the present value testimony offered by the Government's annuity expert. *Cf. Strickland v. Francis*, 738 F.2d 1542, 1552 (11th Cir. 1984) ("clear[ ] and overwhelming[ ]" expert testimony concerning a defendant's incompetency to stand trial); *Rhodes v. Easkold*, 588 So.2d 267 (Fla. 1st Dist.Ct.App.1991) (uncontradicted expert medical testimony).

We also find meritless plaintiffs' claim that the court erred by employing annuity figures that were in effect on the day of trial, rather than by updating those figures to the date the court rendered its judgment.

4. A more detailed statement of the relevant factual and procedural underpinnings of this case may be found in the text of our earlier opinion.

istrate judge's award of $1.3 million to the parents of Loren Dempsey for the "loss of society and affection of their child." We reverse, however, the magistrate judge's denial of damages to Loren's parents for the loss of the "ordinary day-to-day services" of their injured child, and remand for findings in accordance with the opinion of the Florida Supreme Court.[5]

## II.

### A.

We now turn our attention to the federal law issue on appeal: whether, based on the sufficiency of the Government's evidence, the magistrate judge was justified in setting off a portion of Loren Dempsey's award for future medical costs. We review this decision of the trial court under the clearly erroneous standard. Fed.R.Civ.P. 52(a); *see also Cole v. United States*, 861 F.2d 1261, 1263 (11th Cir.1988) (applying clearly erroneous standard to damages determinations in actions brought under the Federal Tort Claims Act); *Reilly v. United States*, 863 F.2d 149, 163 (1st Cir.1988) (reviewing district court's refusal to offset award for future medical costs under clearly erroneous standard). A finding of the trial court will be deemed clearly erroneous only if, "after reviewing all the evidence, we are 'left with the definite and firm conviction that a mistake has been committed.'" *Cole*, 861 F.2d at 1263 (quoting *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Upon reviewing the evidence regarding the setoff in this case, we are not so convinced as to two of three setoffs granted by the magistrate judge; as to them, we therefore affirm. The third setoff, however, is contrary to the evidence and must be set aside.

### B.

Following the bench trial in this case, the magistrate judge held a supplemental evidentiary hearing for the sole purpose of determining whether the Government was entitled to a setoff for a portion of Loren's award for future medical costs because those costs were already covered under CHAMPUS.[6] At the supplemental hearing, the Government introduced Judy Carroll, a health care policy analyst for CHAMPUS who, as part of her duties, is responsible for implementing the policies employed by CHAMPUS. She testified as an expert witness to the following facts:

> CHAMPUS is a medical benefits program available to, *inter alia*, the dependents of certain retired members of the armed services; Loren Dempsey, by virtue of her father's status as a retired enlistee of the United States Air Force, is entitled to receive CHAMPUS benefits.

> Generally, CHAMPUS beneficiaries are expected to obtain their medical care at military facilities that are located in sufficient proximity to their homes (generally within forty miles). At such facilities, CHAMPUS beneficiaries may receive medical treatment and supplies, including medication, at no charge. In the event that necessary medical care is unavailable at a military facility, however, or where the beneficiary does not live near a military

5. In remanding for a determination of the value of Loren's ordinary services, we note that such an award should not be offset by "the cost of maintaining [the child] to maturity [which] would normally exceed the value of any services which might likely be rendered by the child to the parent," because here, unlike in a wrongful death case, the parents of a negligently injured child are still required to meet the costs of rearing their child. *Gresham v. Courson*, 177 So.2d 33, 37 (Fla. 1st Dist.Ct.App.1965); *see also Johnson v. United States*, 780 F.2d 902, 908 (11th Cir.1986).

6. Because neither party contests the magistrate judge's finding that CHAMPUS payments are not a collateral source, and thus are not immune from offset under Florida's collateral source rule, Fla.Stat.Ann. § 768.76 (West Supp.1994), we leave review of that issue, one of first impression in this circuit, for another day. *See, e.g., Mays v. United States*, 806 F.2d 976 (10th Cir.1986) (finding that CHAMPUS is not a collateral source under Colorado's collateral source rule, such that CHAMPUS payments may be applied as setoff to an award of future medical costs).

facility, a CHAMPUS beneficiary may obtain treatment at a private care facility.

Under such circumstances, CHAMPUS pays seventy-five percent of the CHAMPUS "allowable cost" of the private treatment. The CHAMPUS "allowable cost," from which the seventy-five percent payment is calculated, is defined as the lowest of three independent cost measurements: (1) the actual cost of the treatment; (2) the prevailing charge for a given procedure in the particular state; and, (3) the maximum allowable charge permitted under the Medicare Economic Index. Moreover, CHAMPUS pays seventy-five percent of the actual amount billed (as opposed to seventy-five percent of the allowable cost), for medication that must be acquired from a private source.

The CHAMPUS allowable cost, like that of Medicare and Medicaid, is designed to cover the fair market value of a given procedure, although a recent study by the Assistant Secretary of Defense for Health Affairs found that the CHAMPUS allowable amount is higher than the corresponding figure under Medicare.

In addition to her testimony at the supplemental hearing, Ms. Carroll represented, in an affidavit submitted to the court, that "CHAMPUS will pay seventy-five percent of the allowable amount of all future medical expenses as awarded by the Court [in this case] ... [and that] CHAMPUS would pay seventy-five percent of thirty hours of skilled nursing care per month."

At the conclusion of the supplemental hearing, the magistrate judge reviewed each aspect of Loren's proposed award for future medical costs. Based on the evidence adduced at the hearing, the magistrate judge set off certain portions of Loren's award, while refusing to set off others.[7] Specifically, the magistrate judge applied a CHAMPUS setoff to three elements of Loren's future damages award: the full cost of her medication, seventy-five percent of the cost of thirty hours per month (one hour per day) of skilled nursing care throughout Loren's minority, and seventy-five percent of the treatment cost for all of Loren's future complications.[8] With respect to each of these three future costs, the magistrate judge concluded that they already were covered by CHAMPUS, and that to refuse the setoff would result in Loren receiving an impermissible double recovery from the Government.

The Dempseys challenge the sufficiency of the Government's evidence with respect to each award of setoff. Initially, the plaintiffs attack the setoff for the cost of Loren's medication. Although they concede that a seventy-five percent CHAMPUS setoff is appropriate, plaintiffs maintain that the additional twenty-five percent setoff (the remaining portion of the court's one hundred percent setoff) was clearly erroneous in that the Government neither sought nor attempted to prove that it was entitled to anything more than a seventy-five percent setoff. As to the setoff for Loren's nursing care and her future complications, plaintiffs argue that the Government's evidence was insufficient because, although it may have demonstrated that CHAMPUS will pay seventy-five percent of the CHAMPUS allowable cost, it did not establish what the actual monetary

---

7. The magistrate judge, recognizing that "it would be unconscionable to leave an agent of the [Government] with the discretion to determine whether CHAMPUS will pay its share of [Loren's] cost ... and, ultimately, whether Loren receives the items needed," disallowed CHAMPUS setoff wherever the Government failed to establish that the decision whether to pay, as well as what amount to pay, for a given procedure, was non-discretionary. For this reason, the magistrate judge refused to set off the cost of Loren's wheelchair and other durable medical equipment, as well as the cost of her future routine medical care and evaluations, all of which are potentially subject to the discretion of CHAMPUS officials.

8. The total amounts of the offsets that the magistrate judge awarded to the Government are $1,564 for Loren's medication, $51,280 for Loren's skilled nursing care (valued at $8 per hour), and $20,000 for Loren's future complications, while Loren's total award for future costs is almost $1.5 million. All of these figures were reduced to their present value by the magistrate judge.

amount of the CHAMPUS "allowable cost" would be for these two items; accordingly, since the Government did not satisfy its burden of proving the relevant amounts, the award of setoff is clearly erroneous.

### C.

After thoroughly reviewing the record in this case, we cannot say that the Government " 'failed to develop any meaningful evidence' " as to its entitlement to setoff for future CHAMPUS payments as to two of the three setoffs. *Reilly*, 863 F.2d at 163 (quoting *Reilly v. United States*, 665 F.Supp. 976, 1013 (D.R.I.1988)).[9] In fact, rather than bolstering a "definite and firm conviction" that the trial court was mistaken, we find that the record amply supports the magistrate judge's decision to award the two CHAMPUS setoffs to the Government.

■ Initially, the transcript of the supplemental hearing plainly supports the award of a one hundred percent setoff against Loren's award for medication costs. At the hearing, the Government presented evidence that CHAMPUS beneficiaries may obtain cost-free medication at any nearby military facility, and that Loren resides in sufficient proximity to a military pharmacy that is equipped to fulfill her needs in that respect. As such, the magistrate judge's award of the setoff for Loren's drug needs clearly was supported by the evidence.[10]

■ The record in this case likewise justifies the magistrate judge's decision to set off portions of the cost of Loren's future medical complications. Although Ms. Carroll, the Government's CHAMPUS expert, testified that CHAMPUS would cover only "seventy-five percent of the allowable [cost] of all future medical [complications]," she stated that the CHAMPUS allowable cost is designed to cover the fair market value of a given procedure. Ms. Carroll testified further that the CHAMPUS allowable cost is fifty percent greater than the corresponding figure for Medicare (two of the considerations used in determining the CHAMPUS allowable cost). Thus, the Government presented evidence, which we presume to be credible,[11] from which the magistrate judge was able to conclude that the CHAMPUS payments would equal or exceed the amounts awarded in setoff. In so holding, we also recognize that the magistrate judge was in the best position to make such a determination because she also was responsible for divining the amount of the award for Loren's future medical costs from which the setoff was made.

Finally, and not insignificantly, the Government presented evidence that CHAMPUS had paid well in excess of seventy-five percent of Loren's past medical costs—CHAMPUS paid $22,068.69 of the $23,514.06 in medical bills that Loren had accumulated prior to trial. Thus, based on the history of the dealings between CHAMPUS and the

9. The plaintiffs, in framing their argument, rely substantially on the holding in *Reilly*, in which the First Circuit affirmed the district court's refusal to award a CHAMPUS setoff because the Government " 'failed to develop any meaningful evidence as to the extent of the Reillys' eligibility for CHAMPUS payments.' " 863 F.2d at 163 (quoting *Reilly v. United States*, 665 F.Supp. 976, 1013 (D.R.I.1988)). That holding is of little value in this case, however, because the *Reilly* court's analysis is precisely the opposite of the inquiry this case requires. In contrast to *Reilly*, we review the trial judge's grant of a CHAMPUS setoff, not the denial of that setoff. Therefore, rather than decide whether the refusal to allow a CHAMPUS setoff was clearly erroneous, the issue here concerns whether the evidence was minimally sufficient to support the magistrate judge's grant of the setoff. In other words, to determine whether the Government's

evidence met the minimal threshold of "sufficiency," not whether the Government conclusively established its entitlement to the CHAMPUS setoff.

10. We also note in passing, that the magistrate judge did not abuse her discretion by, in effect, requiring Loren to fill her prescriptions for medication from a military facility. *See Self v. Great Lakes Dredge & Dock Co.*, 832 F.2d 1540, 1552 (11th Cir.1987) (reviewing discretionary aspects of a damages award under an abuse of discretion standard).

11. A federal appellate court conducting a review for clear error is required to give "due regard," in its deferential review, to the trial court's opportunity to assess the credibility of witnesses. *Thelma C. Raley, Inc. v. Kleppe*, 867 F.2d 1326, 1328 (11th Cir.1989).

Dempseys prior to this suit, the magistrate judge was justified in concluding that CHAMPUS will continue to pay for at least seventy-five percent of Loren's future medical costs, and that a setoff is therefore proper. *See Kennedy v. United States,* 750 F.Supp. 206, 213 n. 10 (W.D.La.1990) (permitting setoff for CHAMPUS payments of future medical costs based upon evidence that past CHAMPUS payments equalled or exceeded seventy-five percent of plaintiff's past medical treatment).[12]

Thus, the Government presented sufficient evidence from which the magistrate judge could conclude that the Government would pay, through CHAMPUS, one hundred percent of Loren's future medication costs. Moreover, although the Government did not establish the precise monetary amount that CHAMPUS would pay for Loren's future complications, it did present adequate evidence from which the magistrate judge reasonably could conclude that future CHAMPUS payments would equal or exceed the setoff allowed in this case.[13] Accordingly, we reject the plaintiffs' claim that the decision to award of a setoff was clearly erroneous as to these two awards, and therefore affirm them.

### D.

The magistrate judge erred, however, in awarding a CHAMPUS setoff for seventy-five percent of thirty hours of skilled nursing care per month. The magistrate judge concluded, based on the testimony of Ms. Carroll that CHAMPUS would in fact cover seventy-five percent of skilled nursing care per month as opposed to seventy-five percent of the allowable cost for that care. The undisputed evidence, however, shows that CHAMPUS will not pay for the nursing care contemplated in Loren's damages award because it is not within CHAMPUS's definition of skilled nursing care. Therefore, the setoff was clearly erroneous.

The magistrate judge awarded Loren damages to pay for the cost of daily attendant home care, as well as one night per week of "respite" nursing care until Loren reached age twenty-one. The nature and expected costs of such care were detailed in a "life care plan" prepared for Loren by a rehabilitation consultant. That plan specified that the respite care could be provided by a licensed practical nurse, at a cost of no more than $20 per hour. The plan's author testified that such care must be provided by a skilled nurse, such as a licensed practical nurse, who could administer medication and monitor Loren's medical condition while her parents were not in the house. The plan did not specify who would provide the daily attendant care, but the plan's author testified

---

**12.** The transcript of the supplemental hearing, especially of the following exchange, which occurred at the conclusion of that hearing, confirms our view that the magistrate judge devoted considerable attention to the specific concerns raised by the plaintiffs, and that her ultimate conclusion that future CHAMPUS payments would equal or exceed the awarded setoff was based on the testimony discussed above:

> MR. BEARD (Counsel for the Government): Now, on cross-examination I, therefore, anticipate that [Loren Dempsey's counsel] will argue that we don't know how much CHAMPUS will pay both because Ms. Carroll didn't say how much they'll pay, a dollar amount. The simple answer of that is, Ms. Carroll gave the Court a mechanism whereby the Court can determine how much will be paid and that is seventy-five percent of the costs and the Court has established the costs in its order.
>
> THE COURT: Let me interrupt you and ask you—I've established costs or I have found costs from the evidence that was presented but not the CHAMPUS allowable costs. Without that data, how can I make any further finding?

> MR. BEARD: You have that evidence. The evidence is from Ms. Carroll who says that the allowed cost is, in essence, better than the allowed costs nationwide for insurance providers and fifty percent better than Medicaid and Medicare. And so I submit to the Court that if those costs defined by the Court come from the ... testimony [of the Government's expert on present value] who says he was basing it on the same information CHAMPUS bases it on, CHAMPUS is paying more than what other insurance providers would pay and that, therefore, the Court is not presented with the question of "I don't know exactly how much is an allowable claim...."

**13.** In arriving at this conclusion, we are reminded that some degree of ambiguity and imprecision is inevitable when calculating aspects of an award for future damages. As such, if we are reasonably confident that we get the damages right, it is also enough that we are reasonably certain that an award of setoff also is right.

that such care would not require the services of a nurse, and the plan itself indicated that such care could be provided by someone paid significantly less than a licensed practical nurse. Nothing in the plan, or in any of the other evidence, suggests that any of this home care will require the services of a registered nurse.

Against the damages award for these services, the magistrate judge set off the cost of certain nursing care that she anticipated CHAMPUS would cover. According to the magistrate judge, CHAMPUS pays seventy-five percent of the cost of one hour of "skilled nursing care" per day. The evidence supports that finding. However, the evidence also shows that CHAMPUS defines "skilled nursing care" in a way that excludes the home care Loren will require. As explained by a CHAMPUS document in the record:

> CHAMPUS will share the cost of skilled nursing services rendered by a private duty (special) nurse ... in a home setting where:
>
> - the patient requires intensive, skilled nursing care that can be provided *only with the scientific skills and technical proficiency of a registered nurse*
>
> - the care is medically necessary and ordered by a physician. . . .

(Emphasis added.) The document then states: "CHAMPUS benefits for private duty (special) nursing care are limited to that care which qualifies as medically necessary skilled nursing care." It further explains that CHAMPUS will pay for the services of a licensed practical nurse only if a registered nurse is medically necessary, but unavailable. Finally, "services related to the essentials of daily living are not skilled nursing services, even when performed by a private duty (special) nurse."

The evidence could not be clearer. CHAMPUS will pay only for registered nurse care, and that is not the kind of nursing care Loren requires or will receive under her life care plan. The Government, which had the burden of proof on the setoff issues,

introduced no evidence to the contrary. The magistrate judge clearly erred in allowing this part of the setoff, and we reverse that part of the judgment and remand with instructions that the damage award in this case be increased by that amount.

### III.

In summary, we AFFIRM the magistrate judge's award of $1.3 million to Loren Dempsey's parents for the loss of Loren's society and affection, as well as the magistrate judge's setoff for the costs of Loren's medication and future medical complications that will be covered under CHAMPUS. We SET ASIDE the magistrate judge's setoff for skilled nursing care and REMAND for additional findings as to the amount that Loren's parents are entitled to recover for the loss of the ordinary services of their negligently injured child.

IT IS SO ORDERED.

CARNES, Circuit Judge, concurring:

I concur in the majority opinion and judgment. I also write separately to discuss this Court's entry of an immediate partial affirmance of those components of the magistrate judge's judgment that were uncontested on appeal. The published opinions of this Circuit do not otherwise reflect the possibility of such action, and it is an idea that I want to commend to my colleagues and to the attention of parties in future appeals.

On December 19, 1991, the magistrate judge entered a judgment in this case for Loren Dempsey and her parents that totaled $4,184,000.37. The government's appeal did not contest liability, nor did it contest a number of components of the damage award. The uncontested part of the judgment amounted to $2,815,835.00. Because of the government's appeal, none of the judgment, including the uncontested part, had been paid when the case was docketed for oral argument. The brief filed on behalf of Loren indicated that she was not receiving needed care because the government's appeal from a

portion of the judgment prevented payment of any of it.

On our own motion, this Court raised the question of whether we should enter an immediate affirmance of the uncontested part of the damages award. In asking for supplemental briefs on that question, we directed the parties' attention to *Barnes v. United States*, 678 F.2d 10 (3d Cir.1982), which involved the motion of a plaintiff-appellee for partial summary affirmance in a Federal Tort Claims Act (FTCA) case. Even though the government did not contest some of the damage components of the judgment in that case, it nonetheless opposed the motion. The government argued that an appeals court lacked the power to enter a partial summary affirmance. It contended that such action was proscribed by the FTCA and amounted to the impermissible splitting of a cause of action. *Id.* at 12. The Third Circuit correctly rejected those arguments and entered an immediate partial summary affirmance of the undisputed part of the judgment. *Id.* at 12–13; *See also Parker v. Lewis*, 670 F.2d 249 (D.C.Cir.1982) (granting a motion for summary affirmance of the uncontested part of an attorney's fee and costs award).

In this case, the government, to its credit, eschewed the position it had taken in *Barnes* and stated that it did not object to entry of an immediate partial affirmance of the judgment to the extent of the uncontested part of the damages award. On January 26, 1993, we entered the following order:

> The judgment of the district court in this cause is hereby affirmed only insofar as it awards the sum of $2,815,835, plus interest, to Pansy and Lonney Dempsey as natural guardians of the minor plaintiff Loren Dempsey, for the sole benefit of Loren Dempsey, against the United States of America.
>
> The appeal in this cause remains pending in all other respects. *See Barnes v. United States*, 678 F.2d 10 (3d Cir.1982).

As a result of that order, Loren Dempsey received a substantial part of the damages she was due a year and one-half earlier than she would have otherwise had access to the funds.

Where there is a discrete, uncontested amount of damages included in a judgment from which an appeal is taken, there is no reason why an immediate partial summary affirmance should not be entered by this Court to the extent of the uncontested part of the judgment. That is so whether the defendant is the government or some other party, and it is true whether the appeal is filed by the plaintiff or the defendant. The notion that causes of action or judgments are indivisible is metaphysical mumbo-jumbo that courts should not allow to prevent them from seeing that justice is not only done but done promptly. The notion that Congress might have intended in the FTCA, or in any other statute, to prevent victims of government negligence from receiving immediately that portion of the judgment the government concedes they are due, is simply absurd.

Of course, there are practical ramifications to this matter. Providing the plaintiff with a way to obtain access to some part of the judgment while the appeal is pending may encourage appeals by plaintiffs, lessen the incentive for appeals by defendants, and alter the post-trial settlement calculus in such cases. So be it. No party is entitled to benefit from any leverage it might obtain from unnecessary delay in paying that part of a judgment that it indisputably owes.

In future appeals, plaintiffs should move for partial summary affirmance to the extent of any uncontested part of the judgment, and this Court should grant such motions.