CARNES, Circuit Judge:
This is a tragic case in which the negligence of those acting for the United States government destroyed the life of a little boy and did much damage to the lives of his mother and father. The case is here not because anyone questions whether the government should pay, but because there are good faith disagreements about issues affecting how much it must pay.
*1157 I.
Raiza Bravo was entitled to care and treatment at the Naval Hospital in Jacksonville, Florida because her husband, Oscar Rodriguez, was a serviceman in the Navy. On June 10-11, 2003, Bravo was at the hospital for the birth of their child, Kevin Bravo Rodriguez. As a result of medical malpractice, Kevin was born with severe brain injuries. No one disputes that some of those whose negligence caused the injuries were full-time Naval personnel and therefore government employees for purposes of the Federal Tort Claims Act. There is a dispute about whether one doctor whose negligence contributed to the injuries is a government employee for FTCA purposes, and the resolution of that issue will determine what portion of the judgment the government is responsible for paying. There are also disputes about the size of the judgment.
One of the physicians who attended Bravo during the delivery was Dr. Kenneth Kushner, a civilian OB/GYN working at the Naval Hospital on a contractual basis. He is the negligent actor whose status as a government employee for FTCA purposes is in issue. A description of his status requires some explanation of the contractual context in which he worked.
The Department of Defense entered into a contract with Humana Military Healthcare Services, known as the “TRICARE Contract,” through which Humana would provide medical services for eligible military personnel and their dependents. The contract allowed facilities like the Naval Hospital in Jacksonville to enter into their own agreements with Humana, known as “Resource Sharing Agreements” under which Humana (or its subcontractor) provides medical staff for the hospital. These contracts were subject to the terms of the original TRICARE Contract.
The Jacksonville Naval Hospital entered into a Resource Sharing Agreement with Humana, incorporating the hospital’s own OB/GYN “Statement of Work” into the contract; that statement described with specificity the duties and responsibilities of the physician who was contracted to do OB/GYN work at the hospital. Humana, in turn, sub-contracted with Sterling Medical Corporation to supply an OB/GYN physician to the Naval Hospital. Sterling contracted with Dr. Kushner for that purpose, and it was through that contract and Sterling’s contract with Humana, as well as Humana’s contract with the Naval Hospital, that Dr. Kushner came to the hospital as a civilian physician. The same “Statement of Work” included in the contract between Humana and the hospital was in turn incorporated into Dr. Kushner’s contract with Sterling.
Following Kevin’s birth, Dr. Kushner was subjected to peer review, temporarily suspended from the Naval Hospital, and instructed to take a course on fetal monitoring. Later, because of his negligence during Kevin’s birth, the hospital permanently suspended Dr. Kushner’s privileges with the result that he can no longer work there.
II.
Bravo and Rodriguez filed suit against the government on their own behalf and on behalf of Kevin under the FTCA based on the personal injuries Kevin suffered and the loss of consortium with him that they each suffered. Bravo also claimed economic loss because of the time that she was required to spend caring for Kevin and her resulting loss of earning power. Bravo and Rodriguez claimed that Kevin was injured as a result of the wrongful acts and omissions of hospital employees who were acting within the scope of their employment for the United States. They later amended the complaint to add a negligence count against Dr. Kushner individually.
*1158 Bravo and Rodriguez filed a motion for summary judgment asking the district court to find, as a matter of law, that Dr. Kushner was a government employee for FTCA purposes at the time he treated Bravo. Dr. Kushner filed a similar motion seeking the same result. Conversely, the government filed a cross-motion for summary judgment, asking the court to find as a matter of law that Dr. Kushner was an independent contractor and not a government employee. The district court denied the motions and set the case for trial.
After an eleven-day bench trial, the district court issued its findings of fact and conclusions of law. The court determined that the medical evidence indicated that everyone treating Bravo had failed to meet the requisite standard of care and that their negligence contributed substantially to Kevin’s injuries. The government requested that the damages be apportioned under Fla. Stat. § 768.81(3) between the culpable Naval personnel (for which it admitted responsibility) and Dr. Kushner. The court declined to do that because it concluded that Dr. Kushner was himself a government employee for FTCA purposes. As a result there would be no basis for apportionment because the government would be fully responsible for Dr. Kush-ner’s part of the judgment. The court ruled that even if it were wrong about Dr. Kushner being a government employee, apportionment would still not be proper because of two exceptions to Fla. Stat. § 768.81(3): (1) the initial-subsequent tort-feasor exception, and (2) the indivisible injury exception.
The court entered a total judgment against the government in the amount of $60,485,788.98 to Bravo, Rodriguez, and Kevin. That judgment included: (1) $25 million in non-economic damages for Bravo; (2) $603,883 in economic damages for Bravo; (3) $15 million in non-economic damages for Rodriguez; (4) $10 million in non-economic damages for Kevin; and (5) $9,881,905.98 in economic damages for Kevin. At the time judgment was entered Kevin was almost two-and-a-half years old and had a life expectancy of twenty-one years. The damages were calculated based on the parental sacrifices and the surgeries, therapies, and medications that it was projected Kevin would need over the remaining eighteen-and-a-half years of his life as well as the suffering that would be endured during that time.
Dr. Kushner and the government both filed Rule 59 motions to alter or amend the judgment or, alternatively, for a new trial. The district court denied those motions, except that it did reduce the non-economic damages awarded to Bravo and Rodriguez by $10 million each, so that Bravo received $15 million for her non-economic damages and Rodriguez received $5 million for his. The court left the award to Kevin in place. Those reductions lowered the total judgment to $40,485,788.98. The only explanation the court gave for reducing the awards, and the amount of the reductions, was that it was being done “[u]pon consideration of all relevant factors.” Even after the district court reduced the award, it was at that time the largest amount ever awarded to a single family for non-economic damages in the sixty-year history of the FTCA.[1]
*1159 The government filed its notice of appeal on May 22, 2006. Kevin died, at the age of three, on August 21, 2006.
III.
The government raises three primary issues on appeal, contending that the district court erred by: (1) finding that Dr. Kushner was a government employee instead of an independent contractor; (2) failing to apply Fla. Stat. § 768.81(3) to apportion the damages among the joint tortfeasors; and (3) not further reducing the damages awarded.
A
There is some dispute among the circuits about whether an individual’s status as a government employee in a given factual scenario is a question of law subject to de novo review or a question of fact subject to clear error review. See Duplan v. Harper, 188 F.3d 1195, 1200 (10th Cir.1999) (holding that an individual’s status as a government employee for the purpose of the FTCA is a question of law); Linkous v. United States, 142 F.3d 271, 275 (5th Cir.1998) (same); but see Van Camp & Bennion v. United States, 251 F.3d 862, 865 (9th Cir.2001) (“We review for clear error the question whether independent contractor status as opposed to employee status was correctly determined.”). We need not take our place on one side or the other of the split because it does not matter in this case. Under either standard of review, we would leave the district court’s determination of the government employee issue standing.
The district court stated that the question of Dr. Kushner’s employment status was “merely academic,” because the court determined that either of two exceptions to Fla. Stat. § 768.81(3) applied, making all of the defendants jointly and severally liable for the entire damage award regardless of whether Dr. Kushner was an employee of the government. Alternatively, the court addressed the issue of Dr. Kush-ner’s employment status, and interpreted the various contracts to mean that he was employed by the government for FTCA purposes. Because we agree with that alternative ruling we need not address the § 768.81(3) issues.
We have established the “control test” for determining whether an individual is a government employee or an independent contractor: “[A] person is an employee of the Government if the Government controls and supervises the day-to-day activities of the alleged tortfeasor during the relevant time.” Patterson & Wilder Constr. Co. v. United States, 226 F.3d 1269, 1274 (11th Cir.2000). Contrary to the government’s argument, and what might be deduced from the language we have just quoted, the test does not require that the government exercise actual control over an individual. It is enough that the government has reserved the power or authority to control him. In Patterson, we put it this way: “[I]t is not necessary that the Government continually control all aspects of the individual’s activities, so long as it has the authority to do so given the nature of the *1160 task.” Id.; see also Logue v. United States, 412 U.S. 521, 527-28, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121 (1973) (“[T]he critical factor in [determining if an individual is a government employee or an independent contractor] is the authority of the principal to control the detailed physical performance of the contractor.” (emphasis added)).
The question of whether the Naval Hospital reserved the right to control Dr. Kushner’s activities is one whose answer depends on the various contractual provisions. The Naval Hospital’s own “Statement of Work” was incorporated into the Resource Sharing Agreement it had with Humana, and also into Dr. Kushner’s contract with Sterling. The statement establishes that:
The contractor OB/GYN [Dr. Kushner] physician activities shall be subject to day-to-day direction by Navy personnel in a manner comparable to the direction over Navy uniformed and civil service personnel engaged in comparable work. The term “direction” is defined as that process by which the OB/GYN physician receives technical guidance, direction and approval with regard to an element of work or a series of tasks within the requirements of this agreement.
What’s more, the Resource Sharing Agreement between Humana and the hospital was also subject to the original TRICARE contract between Humana and the Department of Defense. The original TRICARE contract, as incorporated into the Resource Sharing Agreement, provided:
[Humana] shall be responsible for monitoring the performance of Resource Sharing personnel [Dr. Kushner] to ensure compliance with the terms and conditions of the Resource Sharing provider agreements. However, this does not preclude Resource Sharing personnel [Dr. Kushner] from complying with directions received from [Navy hospital] professional personnel in the course of patient care activities.
(emphasis added). Even though Humana, as the government contractor, retained the authority to enforce the terms of the agreement, the contractual language makes clear that the Naval Hospital reserved the right to direct Dr. Kushner “in the course of patient care activities.” That TRICARE contract provision and the “Statement of Work” contained in the other contracts show that the government retained sufficient control over the day-today activities of Dr. Kushner to satisfy the Patterson control test.
The Resource Sharing Agreement does provide that “[t]he contractor [Humana] shall be solely liable for negligent acts or omissions of the contractor’s agents [Sterling and Dr. Kushner] and shall ensure that providers maintain full professional liability insurance,” but the allocation of insurance obligations is only one factor in determining an employee’s status. See, e.g., Duplan, 188 F.3d at 1200. We look at the “totality” of the relationship, Patterson, 226 F.3d at 1276, and doing that, we agree with the district court that Dr. Kushner was a government employee for FTCA purposes.
Because Dr. Kushner was an employee of the government, we need not reach the government’s argument that liability should have been apportioned among the separate tortfeasors in accordance with Fla. Stat. § 768.81(3). Regardless of the applicability of that statute, the government is hable for the entire judgment in its role as employer.

B.

Our review of the size of the damages verdict is for clear error. Ferrero v. United States, 603 F.2d 510, 512 (5th Cir.1979).[2] “[T]he components and meas *1161 ure of damages in FTCA claims are taken from the law of the state where the tort occurred.... ” Johnson v. United States, 780 F.2d 902, 907 (11th Cir.1986) (quoting Harden v. United States, 688 F.2d 1025, 1029 (5th Cir. Unit B 1982)) (internal quotation marks omitted). Florida law dictates that a verdict cannot stand if it: (1) “is so extravagant that it shocks the judicial conscience,” (2) “is manifestly unsupported by the evidence,” or (3) “indicates the jury was influenced by passion, prejudice or other matters outside the record.”[3] Citrus County v. McQuillin, 840 So.2d 343, 347 (Fla. 5th DCA 2003); see also Krys v. Lufthansa German Airlines, 119 F.3d 1515, 1530 (11th Cir.1997) (applying Florida law). Florida law is also clear that a “verdict must be set aside if it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the trier of fact may properly operate.” Johnson, 780 F.2d at 908.
In this case, the district court initially awarded a total of more than $60 million with $50 million of that being for non-economic damages. Bravo and Rodriguez were awarded $40 million ($25 million for Bravo and $15 million for Rodriguez) to compensate them for their non-economic suffering, while the child was awarded $10 million for that purpose. Without detailed explanation the court later reduced Bravo’s and Rodriguez’s non-economic damages awards by a total of $20 million, leaving them with $20 million ($15 million for Bravo and $5 million for Rodriguez).[4] The court left in place the child’s non-economic damages award of $10 million. There was also an economic damages award to Bravo of approximately $10 million.
We recognize the deep and abiding tragedy of the loss Bravo and Rodriguez suffered. They are obviously entitled to recover a substantial amount to compensate them for their mental pain and suffering and for the loss of their child’s companionship. Our task as an appellate court, however, is to decide the question of whether the award that Bravo and Rodriguez received is excessive. As the Third District Court of Appeal has explained, the excessiveness of an award is an issue that “will have to be determined in each individual case by the particular court upon the examination of a cold record without being subjected to prejudice and bias that may be occasioned in the emotionally charged atmosphere of a trial courtroom.” Seaboard Coast Line R.R. Co. v. McKelvey, 259 So.2d 777, 781 (Fla. 3d DCA), approved by 270 So.2d 705 (Fla.1972). Performing our task, we conclude that the award to Bravo and Rodriguez of $20 million in non-economic damages is excessive. It does “jar or shock the judicial conscience of an appellate court.” Id. We *1162 reach this conclusion not by “plowing a new and rather circuitous route,” Dissenting op. at 1171, but by walking a well-worn and clearly marked path paved by the Florida court that would have reviewed this judgment if it had been rendered in a state court.
Our conclusion is bolstered by the fact that the $20 million to Bravo and Rodriguez (to say nothing of the additional $10 million to the child) is one of the largest non-economic damages awards ever given anywhere in this country to a single family in the six-decade long history of the FTCA. It is grossly in excess of any non-economic damages award in any FTCA case applying Florida law in this circuit that we have been able to find. See, e.g., Dempsey ex rel. Dempsey v. United States, 32 F.3d 1490, 1497 (11th Cir.1994) (affirming an award of “$1.3 million to [the deceased infant’s] parents for the loss of [their child’s] society and affection” (internal quotation marks omitted)); Johnson, 780 F.2d at 908 (vacating an award of $2 million, a portion of which was for mental pain and suffering, in a medical malpractice case involving the death of an infant because there was “nothing in the record before the district court to justify the amount of damages awarded,” despite the fact that the parents testified at trial); Fairhurst v. United States, 2006 WL 2190553, at *4-5 (N.D.Fla. Aug. 1, 2006) (awarding $500,000 in non-economic damages to surviving spouse of elderly service member for her own pain and suffering and that of her husband in medical malpractice case); Turner v. United States, 2005 WL 2077297, at *9 (M.D.Fla. Aug. 26, 2005) (awarding $2.5 million in non-economic damages to a nine-year-old child who was blinded and suffered “brain damage and severe injuries” as a result of medical malpractice at a naval hospital; also awarding $750,000 in non-economic damages to both of the child’s parents), aff'd in part, rev’d in part, & vacated in part, 514 F.3d 1194 (11th Cir.2008); Grayson v. United States, 748 F.Supp. 854, 863 (S.D.Fla.1990) (awarding $2.95 million dollars in non-economic damages to a navy serviceman whose wife and two children were killed as a result of the Navy’s failure to properly maintain a pier), aff'd in part, vacated in part, 953 F.2d 650 (11th Cir.1992) (unpublished table decision); Williams v. United States, 681 F.Supp. 763, 765 (N.D.Fla.1988) (awarding $900,000 each to parents who lost a young child and recognizing that the parents’ pain and suffering was “real and intense and [would] remain a part of their lives for many years”).
We find further support for our conclusion in the Florida appellate court decisions addressing whether other non-economic damage awards were excessive, which we will discuss in more detail later. Under Florida law an award of non-economic damages must “bear a reasonable relation to the philosophy and general trend of prior decisions in such cases.” Johnson, 780 F.2d at 907 (quoting Gresham v. Courson, 177 So.2d 33, 39-40 (Fla. 1st DCA 1965)) (applying Florida law); see also id. at 907-08 (“[I]t must bear some reasonable relation to ... the philosophy and general trend of decisions effecting such cases.” (quoting Fla. Dairies Co. v. Rogers, 119 Fla. 451, 161 So. 85, 88 (1935))).
We first grappled with this standard in the Johnson case. There we vacated a judgment of $2 million in an FTCA medical malpractice case because the district court had erred in excluding the testimony of a government expert witness. Johnson, 780 F.2d at 906. We also reached an alternative holding to support our decision. Id. That alternative holding counts because in this circuit additional or alternative holdings are not dicta, but instead are as binding as solitary holdings. Johnson v. DeSoto County Bd. of *1163 Comm’rs, 72 F.3d 1556, 1562 (11th Cir.1996) (“[W]e are bound by alternative holdings.”); McLellan v. Miss. Power & Light Co., 545 F.2d 919, 925 n. 21 (5th Cir.1977) (en banc) (“It has long been settled that all alternative rationales for a given result have precedential value. It does not make a reason given for a conclusion in a case obiter dictum, because it is only one of two reasons for the same conclusion.” (internal quotation marks and citations omitted)); see also Massachusetts v. United States, 333 U.S. 611, 623, 68 S.Ct. 747, 754, 92 L.Ed. 968 (1948) (explaining that where a decision “rested as much upon the one determination as the other .... the adjudication is effective for both”).
We held in Johnson that, even putting aside the evidentiary error, the judgment still was due to be reversed because the $2 million non-economic damages award was excessive. Johnson, 780 F.2d at 906. In articulating the standard for gauging ex-eessiveness under Florida law, we noted that “Florida appellate courts rely heavily on the damages awarded by juries in similar cases,” id. at 907, and we explained that:
Although excessiveness may be tested by comparing the verdict to those damage awards determined not to be excessive in similar cases, we have been unable to find any reported case in Florida with an award this high. Perhaps some research or compilation of similar cases tried in Florida is available that could be submitted to the court and could be made a part of the record to furnish a basis for the amount that should ultimately be awarded.
Id. at 908 (citations omitted).
The parties disagree about what that passage from our Johnson opinion means. The crux of their disagreement is whether we should confíne our review to published decisions of Florida appellate courts in gauging the philosophy and general trend of decisions in cases similar to this one. The government’s position is that we should look only to reported appellate decisions applying Florida law that actually decide whether awards are excessive. Bravo and Rodriguez argue that we should also look to jury verdicts, trial court opinions, and reported appellate decisions that affirm judgments even when they do not address whether the award was excessive.
We acknowledge, as the dissenting opinion points out, that district courts and some appellate courts in Florida have interpreted Johnson as Bravo and Rodriguez argue we should. See, e.g., Grayson, 748 F.Supp. at 863 (considering both jury verdicts and settlements in “ascertaining the trend of damage awards”);[5] Williams, *1164 681 F.Supp. at 764-65 (purporting to apply Johnson and considering jury verdicts and Florida appellate decisions to gauge the excessiveness of non-economic damages award); McQuillin, 840 So.2d at 347 & n. 2 (reviewing awards affirmed by another Florida appellate court, other states’ appellate courts, the Eleventh Circuit, and one federal district court, and concluding that an award of non-economic damages totaling $4.4 million “although on the outer limit in size, [was] not so excessive as to shock [the court’s] composite judicial consciences”); cf. Kammer v. Hurley, 765 So.2d 975 (Fla. 4th DCA 2000) (reversing the trial court’s remittitur order after concluding that portions of the non-economic damages awarded were not excessive when measured against other Florida appellate decisions, one of which did not address the issue of excessiveness).
Other courts, including other Florida appellate courts, in judging excessiveness have limited their consideration of other awards to those that have been challenged on appeal. See, e.g., Compania Dominicana de Aviacion v. Knapp, 251 So.2d 18, 23 (Fla. 3d DCA 1971) (determining that a verdict which included non-economic damages in a wrongful death case was not excessive after comparing it to reported Florida appellate decisions and rejecting one party’s reliance on “mere reports of trial verdicts” because such reports were “not binding as precedent” and were “factually distinguishable”); Smith v. Goodpasture, 179 So.2d 240, 242 (Fla. 2d DCA 1965) (reversing an award for non-economic damages as excessive because it did not bear a “reasonable relation to ... the philosophy and general trend of decisions affecting such cases” and citing only published Florida appellate decisions in determining the trend); Gresham, 177 So.2d at 39-40 (reversing an award of non-economic damages as excessive after “duly not[ing] the amount of damages sustained by the appellate courts of Florida in like actions”).
Presented with this variation among the state appellate courts as to the proper approach, because we are bound to decide the issue the way the Florida courts would have, we look to the decisions of the Florida appellate court that would have had jurisdiction over an appeal in this case had it been filed in state court. See Farmer v. Travelers Indem. Co., 539 F.2d 562, 563 (5th Cir.1976) (“A state action by this Lee County plaintiff would have been reviewed by the Second District [Court of Appeal]. Undoubtedly the trial court and the Second District would have followed the recent Second District opinion. Thus, the same law has been applied in federal court as would have been applied in the specific courts available to plaintiff in the state system.”); see also Peoples Bank of Polk County v. Roberts, 779 F.2d 1544, 1546 (11th Cir.1986) (following a particular District Court of Appeal decision because “it is the law that would have been applied in the specific courts available to plaintiff in the state system” (internal quotation marks omitted)). This case was filed in the Miami Division of the United States District Court for the Southern District of Florida. State courts located there are within the territory of, and are bound to follow decisions issued by, the Third District Court of Appeal.
Every decision we have found of the Third District Court of Appeal that looks to other judgments, thereby applying the general trend and philosophy approach to judging the excessiveness of non-economic damages awards, considers only awards that have been challenged and up *1165 held on appeal. In Metropolitan Dade County v. Dillon, 305 So.2d 36 (Fla. 3d DCA 1974), the court looked to two reported Florida appellate decisions when it applied the “shocks the conscience” standard and affirmed an award of $900,000 to parents of a six-year-old child killed by a county garbage truck. Dillon, 305 So.2d at 40-41. In McKelvey, the court noted that it had been “pointed to a number of authorities throughout [the] country on the amount of damages approved by appellate courts” for similar injuries. McKelvey, 259 So.2d at 780. Nevertheless, the court only cited and relied on reported Florida appellate decisions to assess whether an award of $399,000 for pain and suffering for the loss of an arm was excessive and concluded that it was not. Id. at 780-81. In Knapp, the court determined that a verdict which included non-economic damages in a wrongful death case was not excessive, but it did so only after comparing it to reported Florida appellate decisions. Knapp, 251 So.2d at 23. In the course of doing that, the court refused to consider “numerous million dollar jury verdicts” in part because “[m]any are mere reports of trial verdicts which are not binding as precedent.” Id. None of those Third District Court of Appeal decisions measuring the philosophy and trend of judgments in Florida looked to judgments that had not been size-tested on appeal.[6]
Our dissenting colleague points out that in Loftin v. Wilson, 67 So.2d 185 (Fla.1953), a decision we cited in Johnson, the Florida Supreme Court relied not only on Florida appellate decisions but also on trial and appellate opinions from outside of Florida to gauge the excessiveness of a non-economic damages award. Loftin, 67 So.2d at 189-90. If we were operating in a decisional vacuum, Loftin might affect our analysis, but the atmosphere we are working in includes later Third District Court of Appeal decisions, one of which the Florida Supreme Court affirmed. See Seaboard Coast Line R.R. Co. v. McKelvey, 270 So.2d 705, 706-07 (Fla.1972). Because we are bound to apply the specific law that would govern if this case were brought in *1166 state court, which in this case would be the Third District Court of Appeal’s approach to size-testing non-economic damages awards against only published Florida appellate decisions, an approach the Florida Supreme Court has affirmed, Loftin does not dictate that we decide this case differently.[7]
There is also the fact that our Johnson opinion speaks of “reported” cases and uses the descriptive phrase “damage awards determined not to be excessive in similar cases,” language which most aptly describes awards reviewed for excessiveness on appeal. In Johnson we relied on Gresham v. Courson, 177 So.2d 33 (Fla. 1st DCA 1965), when articulating the rule that we look only to reported Florida appellate decisions to measure excessiveness. Johnson, 780 F.2d at 907-08. The First District Court of Appeal in Gresham looked only to reported decisions of Florida’s appellate courts to guide its determination of whether an award for pain and suffering in an action for the wrongful death of a child bore a “reasonable relation to the philosophy and general trend of prior decisions in such cases.” Gresham, 177 So.2d at 39. After reviewing the “only reported case in [Florida] involving the wrongful death of the child of the age” of the plaintiffs child, and after noting “the amount of damages sustained by the appellate courts of Florida in like actions,” the court reduced the award accordingly. Id. at 38-40.
This interpretation of Johnson makes sense. The restriction of our consideration to reported appellate decisions in which awards were tested for size assures that we assess the “philosophy and general trend of prior decisions in such cases” on a statewide basis, not on the basis of varied trial court decisions. Focusing on awards that are appealed is also essential to ensuring that the measure is not skewed by phantom awards. There are a number of reasons that a verdict or award entered at the trial stage may not realistically reflect what is actually going on in the world of damage awards. Sometimes the limits of the defendant’s assets or of its insurance policy make most of an award meaningless and remove any incentive for testing its size on appeal. Other times there will be a high-low agreement that renders much of an award academic. Still other times the parties will settle after the verdict or award is announced for a more realistic amount which is not disclosed. In each of those situations, phantom awards that *1167 might well have been set aside as excessive on appeal, or even in further proceedings at the trial stage, are left to haunt the judgment books.
To take just one example, consider a case in which a jury returns a verdict for $100 million in non-economic damages. News of that huge verdict will, of course, be heralded in the usual bulletins and newsletters. The attorneys for both sides will recognize that an award of that size has no chance of being upheld on appeal. Suppose as well that it goes about $98 million beyond the assets and insurance of the defendant anyway. The two sides will do what we encourage them to do, which is to negotiate a more realistic figure between one and two million dollars. Settlements like that one are often kept confidential, and the news of the $100 million award cannot be recalled. Under Bravo and Rodriguez’s view the ghost of that other-worldly award would establish that anything less than $100 million is not excessive. It cannot be.[8]
At oral argument the parents’ counsel relied heavily on Eagleman v. Korzeniowski 924 So.2d 855 (Fla. 4th DCA 2006). The facts of that case are similar to those in this case, and there was a large award of non-economic damages: $7 million to each parent and $17 million to the child. Id. at 858. The damages award, however, was not appropriately appealed in the Ea-gleman case. In fact, the defendant’s counsel failed to properly preserve any issues for appeal and the point of the Florida appellate court’s opinion was “to remind trial counsel of the necessity of a proper objection to preserve issues for appellate review.” Id. at 856-57. The court determined that none of the issues raised on appeal were properly before it and dismissed the appeal. Id. at 856. Because the damages award was not put into issue and was not addressed by the Eagleman decision, it does not assist us in assessing Florida’s “philosophy and general trend” regarding non-economic damages. (Even if the issue of excessiveness had been raised and the award affirmed, the $14 million awarded to the parents in Eagle-man would still be less than the total award to the parents in this case.)
Bravo and Rodriguez have also brought to our attention two other large jury verdicts. See Hinton v. 2331 Adams St. Corp., No. 01-12933 (Fla.Cir.Ct. Jan. 30, 2003) (awarding $45 million in non-economic damages); Navarro v. Austin, No. 02-6154, 2006 WL 4530263 (Fla.Cir.Ct. Sept. 29, 2006) (awarding $46.5 million in non-economic damages). We know nothing about the facts of those two cases. We do not know what happened to the awards after they were entered. We do not know whether they were later set aside by the trial court, or if there was a post-award settlement for a substantially lower amount. We do know that there was a post-judgment settlement in Navarro, but the details of it are unknown. See supra at 1167 n. 8. We also know that there is no appellate decision sustaining against an excessiveness challenge the award in either of those two cases.
*1168 Cases resulting in recent appellate decisions actually addressing whether a given damage award is excessive are far more helpful, and there are some of those. See, e.g., Glabman v. De La Cruz, 954 So.2d 60, 62-63 (Fla. 3d DCA 2007) (per curiam) (reversing as excessive the award of $8 million in non-economic damages to the parents of a teenage girl who died as a result of medical malpractice, reasoning that it was so large it could only have been the product of passion and emotion); Citrus County v. McQuillin, 840 So.2d 343, 347 (Fla. 5th DCA 2003) (holding that a $4.4 million verdict in non-economic damages to the seven-year-old son of a woman who was killed in a car accident, while “on the outer limit in size,” was not so excessive as to require reduction (emphasis added)); Kammer v. Hurley, 765 So.2d 975, 978 (Fla. 4th DCA 2000) (holding that a $2.5 million award to each parent for mental pain and anguish was not excessive where doctor negligently crushed the skull of the child just before birth, causing a stillborn delivery); see also Walt Disney World Co. v. Goode, 501 So.2d 622, 626 (Fla. 5th DCA 1986) (holding that award of $1 million for past and future pain and suffering to each parent of a child who drowned on amusement park premises was not excessive).
Those decisions establish, among other things, that a total award of $5 million in non-economic damages to both parents of a child killed by medical malpractice was not excessive in 2000, Kammer, 765 So.2d at 977-78, and that a $4.4 million non-economic damages award in 2003 also was not excessive, although the Florida appellate court noted that it did push the outer limits of permissible size, McQuillin, 840 So.2d at 347. Those decisions also establish that in 2003 a total award of $8 million in non-economic damages to parents for the loss of a child through medical malpractice was so excessive that it could only have been the product of passion and emotion. Glabman, 954 So.2d at 62-63.
The most favorable decision for Bravo and Rodriguez is General Motors Corp. v. McGee, 837 So.2d 1010 (Fla. 4th DCA 2002). In that case the parents watched as their son was trapped in a burning car. McGee, 837 So.2d at 1015. He finally escaped but died later. Id. at 1016. Before the child died, he suffered burns over 98 percent of his body, but he could not even cry out because his vocal cords were “scorched.” Id. The emergency room staff had to cut off his skin to relieve the pressure on his chest. Id. The physician who supervised the boy’s care in the last few hours of his life described his injuries as the worst he had seen in a surviving burn victim. Id. The boy’s father recounted seeing the boy suffer after the accident, recalling that “[h]e was black, he was just burned. I didn’t see any hair, I didn’t see any ears. I could see his braces; he had wor[n] braces.” Id. at 1016 n. 4. Both parents were also severely burned in the accident, as was their daughter. Id. at 1016. The mother’s and daughter’s burns were so severe that they each had to be immersed in a stainless steel tub of antiseptic to have their blisters scrubbed off every day. Id. The parents were not only suffering terribly from their own wounds and grieving over the loss of their son, but they also had to endure their daughter’s screams as she had her burn blisters scraped and treated twice daily. Id.
The Fourth District Court of Appeal affirmed a total judgment of $60 million against General Motors in the McGee case. Id. at 1030, 1039. Included in that total was $30 million to the parents for non-economic damages stemming from their son’s injuries and death. Id. at 1030. In affirming, the court stated that in the sixty years combined judicial experience of the *1169 judges on that appellate panel, “[t]hese injuries and the suffering they caused were extraordinary, among the worst that this panel has ever encountered.” Id. at 1039.
The 2002 McGee decision by the Fourth District Court of Appeal must be read not only against the total facts and circumstances of that case, but also in light of the other Florida appellate court decisions of the same era. One year after the McGee decision the Fifth District Court of Appeal held that a $4.4 million award for non-economic damages to a seven-year-old for the death of his mother was “on the outer limit in size” of what is permissible. McQuillin, 840 So.2d at 347. And five years after the McGee decision-just last year — the Third District Court of Appeal reversed an award of $8 million in non-economic damages to the parents ($4 million to each) of a child killed through medical malpractice on the ground that the amount was so large that it must have been the product of emotion and passion. Glabman, 954 So.2d at 62. The McQuillin and Glabman decisions are more recent than the McGee decision and convince us that McGee is the outlier.
It is difficult to reconcile the Fourth District Court of Appeal’s McGee decision on the one hand, and the Third and Fifth District Court of Appeals’ Glabman and McQuillin decisions on the other. Given the lack of any fixed, precise standards it may simply be that the point at which an award shocks the judicial conscience varies from district court of appeal to district court of appeal in Florida.[9] Our choice between them is guided by our duty, which we have already noted, to decide this issue the way it would have been decided if the case had arisen in the state courts and had been appealed there. The award would have been reviewed by the Third District Court of Appeal. That court would not be bound by the Fourth District’s McGee decision, but would instead follow its own decision last year in Glabman. For that reason, we will follow it too.
For all of these reasons, we conclude that the record-setting award of non-economic damages in this FTCA case — $15 million to Bravo and $5 million to Rodriguez — is “so extravagant that it shocks the judicial conscience,” McQuillin, 840 So.2d at 347, and for that reason it is clear error which must be overturned.

C.

The government also contends that the award of $10 million in non-economic damages to Kevin himself is excessive, but in light of the abatement doctrine that is an issue we need not address. The parties agreed at oral argument that because Kevin died during the pendency of this appeal, *1170 if we vacated any part of the judgment and remanded for any reason, the judgment would no longer be “final” and the Florida abatement statute, Fla. Stat. § 768.20, would apply. We are vacating the portion of the judgment awarding non-economic damages to Bravo and Rodriguez, so the abatement statute does apply.
As a result, the medical malpractice personal injury action will abate and be replaced by a wrongful death action. Kevin’s personal claims will not survive his death, and both the economic and non-economic damages awarded to him will have to be reevaluated accordingly. See Variety Children’s Hosp., Inc. v. Perkins, 382 So.2d 331, 336 & n. 1 (Fla. 3d DCA 1980) (noting that had the court not affirmed the decision below and instead reversed on the merits, “the action would again be ‘pending’ in the lower court and would, by operation of Sec. 768.20, then be subject to abatement”); Levey, 909 So.2d at 908 n. 16 (noting that the effect of the death of the plaintiff on the reversed final judgment “may be to ‘abate’ the personal injury action entirely in favor of a yet-to-be brought action for [the plaintiffs] wrongful death”). Likewise, Bravo’s and Rodriguez’s derivative loss of consortium claims do not survive Kevin’s death. See ACandS, Inc. v. Redd, 703 So.2d 492, 494 (Fla. 3d DCA 1997) (holding that a spouse’s loss of consortium claim is a derivative action that abates with the death of the injured spouse).[10]

D.

As for the district court’s award of economic damages to Bravo, we have no need to pass on the government’s contention that the district court clearly erred in calculating them. Because the calculation was based on Kevin living twenty-one years, it will have to be re-calculated on remand. Should the government’s dissatisfaction about that measure of damages survive the remand it can file an appeal from the new judgment. Unless and until that happens, it would be premature for us to speak to any of the issues that may arise in a future appeal.
IV.
The judgment entered against the government is VACATED, and the ease is REMANDED to the district court for further proceedings consistent with this opinion.

. The government asserted in its briefs that the award of $30,000,000 in non-economic damages in this case is the largest ever to a single family. Bravo and Rodriguez did not disagree. While our own research suggests that assertion was true at the time the government made it, a recent award by a California district court is slightly higher. In Gutierrez v. United States, No. 8:04-cv-01045-AHS-AN (C.D.Cal. Sept. 5, 2007), appeal filed, No. 07-56708 (9th Cir. Nov. 5, 2007), the court awarded a severely injured four-year-old child with a life expectancy of thirty-five years $31,000,000 in non-economic damages and *1159 also awarded the child’s mother $750,000 in non-economic damages. Gutierrez, No. 8:04-cv-01045-AHS-AN, slip op. at 9, 27, 38-39. The government has appealed the judgment in Gutierrez to the Ninth Circuit. See Gutierrez v. United States, No. 07-56708 (9th Cir. Nov. 5, 2007).
Our dissenting colleague cites another large FTCA judgment from the Fifth Circuit, Dickerson ex rel. Dickerson v. United States, 280 F.3d 470 (5th Cir.2002), and notes that the total award in that case, before it was reduced on appeal, was higher than the total award here. This observation is true, but irrelevant. We are not concerned with the size of the total award in this case, but instead with the size of the non-economic damages portion of the award.

. In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this *1161 Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

. Our dissenting colleague makes much of the fact that we have pointed to no evidence that the factfinder, in this case the district court judge, was "influenced by passion, prejudice or other matters outside the record,” Citrus County v. McQuillin, 840 So.2d 343, 347 (Fla. 5th DCA 2003), or that the award “is manifestly unsupported by the evidence,” id. Dissenting op. at 1179. Our decision does not, and need not, rest on those bases. Instead, we confine our discussion to the first reason to set aside a verdict as excessive, that it "is so extravagant that it shocks the judicial conscience,” McQuillin, 840 So.2d at 347, and to the requirement under Florida law that an award of non-economic damages "bear a reasonable relation to the philosophy and general trend of prior decisions in such cases,” Johnson, 780 F.2d at 907.

. The government filed a motion for new trial, or in the alternative, to amend the judgment. The district court entered an order denying that motion, except to the extent that it did reduce the award of non-economic damages to Bravo and Rodriguez by $10 million each.

. Our dissenting colleague notes that we affirmed the district court’s judgment in Gray-son. Dissenting op. at 1175. That affirmance gives no additional weight to the district court’s opinion in that case. Our entire unpublished opinion in that case simply reads: "The judgment of the district court is AFFIRMED except the district court’s award of interest from the date of the initial judgment as opposed to date of the affirmance is vacated.” Grayson v. United States, 953 F.2d 650 (11th Cir.1992) (unpublished table decision). Because our Grayson opinion is unpublished, it is not binding precedent, 11th Cir. R. 36-2.
In its opinion in Grayson the district court listed a number of verdicts and settlements that it considered in setting an award of non-economic damages for the loss of the Gray-son’s children. Grayson, 748 F.Supp. at 863-66. The court summarized those cases: "Four of the nineteen cases involve damages for the death of a child under ten years old. In these four cases, it appears that damages for a parent approximated $1 million for the wrongful death of a child.” Id. at 863. The district court did not pick the highest judgment it could find but instead came up with a general amount or average. The resulting award was for $1.7 million in 1990 dollars ($850,000 for the death of each child). Id. Adjusted for inflation that award would be approximately $1,350,000 for each child in today’s dollars. So, if we were to use the *1164 Grayson case as our touchstone, we certainly would vacate the $20 million non-economic damages award Bravo and Rodriguez received in this case.

. The dissent cites Sta-Rite Industries, Inc. v. Levey, 909 So.2d 901 (Fla. 3d DCA 2004), as an example of a Third District Court of Appeal decision considering a trial court opinion from another state to determine whether a damages award was excessive. In Levey the Third District Court of Appeal reversed a judgment of $104,409,053.20, some unknown portion of which was for non-economic damages. Id. at 903, 909. The court did so because it concluded that the award was based on "equivocal and uncertain testimony,” was "shockingly excessive," and was "contrary to the manifest weight of the evidence.” Id. at 909. In one of the string citations that follows those conclusions, the court cited a decision of the Northern District of New York, Slade v. Whitco Corp., 811 F.Supp. 71 (N.D.N.Y.1993). Levey, 909 So.2d at 909.
The Levey court did not compare the damages award before it to Slade, or to any of the Florida decisions contained in the string citations. Id. The string citations in Levey look nothing like the fact and amount-driven comparisons present in Knapp, McKelvey, and Dillon. Compare id., with Knapp, 251 So.2d at 23, McKelvey, 259 So.2d at 780-81, and Dillon, 305 So.2d at 40. Instead, it seems clear that the court cited Slade, and other cases, for the straightforward proposition that a damages award "not based upon sufficient credible evidence” cannot be sustained. Slade, 811 F.Supp. at 76. Our interpretation of Le-vey is bolstered by the fact that the Slade court left in place the jury's non-economic damages award but ordered a remittitur of the economic damages award, which it concluded was not supported by the evidence but instead speculative testimony about the injured person’s life expectancy. Slade, 811 F.Supp. at 77-78. The Third District Court of Appeal in Levey was faced with similarly "uncertain testimony” about the injured person's life expectancy. Levey, 909 So.2d at 909. We therefore read Levey not as a retreat from the approach set forth in Knapp, McKelvey, and Dillon, but as a nod to persuasive authority from another jurisdiction on a relevant point of law.

. We disagree with the dissenting opinion's characterization of the relationship between Loftin and McKelvey. While it is true that the Florida District Courts of Appeal may not overrule a decision of the Florida Supreme Court, that is not what we have here. Even though the Florida Supreme Court did not discuss the Third District Court of Appeal's approach to selecting comparator cases in its decision affirming McKelvey, it did affirm McKelvey, which is good enough for our purposes. Moreover, in McKelvey the Third District Court of Appeal cited Loftin. See McKelvey, 259 So.2d at 781. It gave no hint of any conflict between its decision and Loftin. We will not second-guess the relevant Florida appellate court's read of this state law issue, especially since the Third District Court of Appeal has used the approach we take to settling this issue both before and after McKelvey.
We also disagree with our dissenting colleague's suggestion that we should infer from McKelvey that "the comparative analysis is not confined solely to published Florida decisions.” Dissenting op. at 1174 n.3. McKel-vey cited no decisions from outside of Florida. That the parties to the case "pointed to a number of authorities throughout [the] country on the amount of damages approved by appellate courts” for similar injuries, McKelvey, 259 So.2d at 780, does not mean that the court adopted that approach. If the court had relied on decisions from outside of Florida to gauge excessiveness, it would have told us so by citing those decisions. The fact that it did not do so is telling.

. This is not a farfetched example. One of the judgments that Bravo and Rodriguez relied on in the district court and before us awarded a total of $46.5 million in non-economic damages. See Appellee's Br. Ex. A (citing Navarro v. Austin, No. 02-6154, 2006 WL 3490745 (Fla.Cir.Ct. Sept. 29, 2006)). The public docket in that case indicates that sometime after the notice of appeal was filed the parties filed a joint motion to dismiss, which was granted, and thereafter there is an entry stating: "Approval of Global Mediated Settlement Granted.” We do not know the settlement amount or how much of it was for non-economic damages, yet Bravo and Rodriguez would have us count the huge pre-settlement award in Navarro in their favor. That we will not do.

. The Florida Supreme Court, of course, could resolve the differences between the district courts of appeal, but it has been more than thirty years since that Court’s last decision on the subject. See Seaboard Coast Line R.R. Co. v. McKelvey, 270 So.2d 705 (Fla.1972). There is unlikely to ever be another one from it, because the Florida Legislature has resolved the matter.
In 2003 the legislature enacted a statute imposing a $1 million cap on "the total non-economic damages recoverable from all practitioners, regardless of the number of claimants” in all medical malpractice cases resulting in a permanent vegetative state or death. Fla. Stat. § 766.118(2)(b). As a result of that statute, except possibly for one or two remaining pre-enactment, straggler cases, there will never be another non-economic damages award above $1 million in a case like this one.
The reform legislation does not apply to this case because the complaint was filed just days before the effective date of the act. Nevertheless, it is interesting to note that the people of Florida through their representatives have decided that the ceiling for non-economic damages in cases like this one ought to be $19 million less, or 95 percent lower, than was awarded to Bravo and Rodriguez.

. There appears to be a split among the district courts of appeal in Florida as to whether a loss of consortium action is derivative (abating with the injured party's death) or independent (surviving the injured party's death). Compare Taylor v. Orlando Clinic, 555 So.2d 876, 878 (Fla. 5th DCA 1989) (holding consortium claim survives husband’s death), with ACandS, 703 So.2d at 494 (holding consortium claim is derivative and, like the injured party's claim, abates with the injured party's death). We are persuaded by the reasoning of the Third Circuit Court of Appeal in that the loss of consortium claim is derivative and abates. ACandS, 703 So.2d at 494. We again note that had this case been filed in state court in Miami, the law of the Florida Third Circuit Court of Appeal no doubt would have been applied. See Farmer, 539 F.2d at 563.