[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10281
Non-Argument Calendar
_____

D.C. Docket No. 6:13-cv-00058-BAE-GRS

BARTOW C. DUTTON,

Plaintiff,

EDNA R. DUTTON,
Individually and as Administrator of the Estate of Bartow C. Dutton,

Plaintiff-Appellant,

versus

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(June 16, 2015)

Before MARCUS, WILLIAM PRYOR, and MARTIN, Circuit Judges.

PER CURIAM:

Edna R. Dutton, as administrator of the estate of her late husband Bartow C. Dutton, appeals the dismissal of her Federal Tort Claims Act (FTCA) claim, 28 U.S.C. § 1346(b).  Dutton alleges that doctors and staff of the Charlie Norwood Veterans Administration Medical Center (VAMC) committed medical malpractice under Georgia law.  Specifically, she argues that Dr. David H. Riggans failed to properly perform an angiography, and that subsequently, various other VAMC employees failed to properly treat a condition that developed in Dutton's right leg.  She contends that these failures resulted in "Mr. Dutton's intense suffering, agony and the loss of his entire right leg due to amputation."  The district court granted partial summary judgment to the United States for claims against Dr. Riggans because he was an independent contractor—not an employee—under the FTCA.  The court then granted summary judgment to the government on all remaining claims, holding that Dutton's only proffered expert was not competent to testify under Georgia evidentiary rules, O.C.G.A. § 24-7-702(c).  After careful consideration, we affirm.

## I.

Bartow Dutton was a veteran eligible for medical care at the VAMC.  On May 24, 2010, Dutton was admitted to the VAMC after complaining of abdominal pain, vomiting, and loose stools.  Testing revealed that he suffered from mesenteric

2

ischemia, a vascular disease in which insufficient blood supply to the small intestine causes intestinal damage.  As treatment, Dr. Riggans attempted to stent the blocked superior mesenteric artery.  That attempt failed.

The night after the failed procedure, Dutton told staff at the VAMC that he felt as though he was losing blood flow in his right leg.  A nurse could feel no pulse in his foot, and noted that his leg was discolored and cool to the touch.  A vascular surgery team evaluated Dutton and determined that he had developed a blood clot in his right leg.  Still, Dr. Manuel F. Ramirez, who led the team, recommended conservative treatment, noting the following:

> Given, patient's active issues with mesenteric ischemia and GI bleed, he has a strong contraindication to anticoagulation, the patient was instructed to hang his right leg off the side of his bed and to be treated with conservative measures at this point in time.

> It was discussed [with the] patient that there may be a possibility that he will require an AKA [above knee amputation] in the future.

The next morning, Dutton's right leg remained cold and pulseless.  Dr. Ramirez noted that the "general consensus was to proceed with a repeat aortogram with intent to revascularize the celiac trunk and proceed with ly[t]ic therapy of his thrombosed RLE."  Dutton was transferred to the Medical College of Georgia to continue lytic therapy.  The therapy was unsuccessful, and "in light of the patient's mesenteric ischemia and risk of having an acute dead bowel presentation masked by the right lower extremity problems, it was decided to proceed with a lower

3

extremity amputation."  Dutton's right leg was amputated on June 6, 2010.

## II.

"We review <u>de novo</u> the district court's grant of summary judgment and use the same standard of review utilized by the district court."  <u>Miccosukee Tribe of Indians of Fla. v. United States</u>, 566 F.3d 1257, 1264 (11th Cir. 2009).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  A court views the facts in the light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).  Summary judgment is appropriate when a non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

## III.

We first address whether the district court erred by granting partial summary judgment because Dr. Riggans was an independent contractor.  The FTCA "waive[s] the sovereign immunity of the United States for certain torts committed by federal employees."  <u>FDIC v. Meyer</u>, 510 U.S. 471, 475, 114 S. Ct. 996, 1000 (1994) (citing § 1346(b)).  But a plaintiff may not recover against the United States

4

for the torts of an independent contractor.  Means v. United States, 176 F.3d 1376, 1379–80 (11th Cir. 1999).  Under this Court's precedent, "a person is not an 'employee of the government' for FTCA purposes unless the government controls and supervises the day-to-day activities of the individual."  Id. at 1379.  Said another way, "the critical factor in making this determination is the authority of the principal to control the detailed physical performance of the contractor."  Logue v. United States, 412 U.S. 521, 527–28, 93 S. Ct. 2215, 2219 (1973).

We hold that Dr. Riggans was an independent contractor, not a federal employee.  Dr. Riggans was an employee of Vascular Radiology Associates II (VRA).  The contract between VRA and the VAMC states that VRA shall render services to the VAMC "in its capacity as an independent contractor," and that VRA shall provide its workers compensation, insurance, health examinations, income tax withholding, and social security payments.  More importantly, the contract expressly states:

> The Government may evaluate the quality of professional and administrative services provided but retains no control over professional aspects of the services rendered, including by example, the Contractor's or its health-care providers' professional medical judgment, diagnosis, or specific medical treatments.  The Contractor and its health-care providers shall be liable for their liability-producing acts or omissions.[1]

---

[1] This language is almost identical to the language in the contract at issue in Tsosie v. United States, 452 F.3d 1161 (10th Cir. 2006), in which the Tenth Circuit held that a doctor was an independent contractor—not an employee—for purposes of the FTCA.  Id. at 1164–65.

Further, VRA—not the VAMC—established Dr. Riggans's work schedule, and Dr. Riggans spent only one-fourth of his time working at the VAMC.

Beyond the terms of the contract, the parties' performance suggests that the VAMC did not control Dr. Riggans's day-to-day activities. Dr. Riggans testified that VAMC policies did not "dictate[] . . . any specific procedure" he performed. He added that "[t]he steps that [he went] through to complete [a] procedure [were] 100 percent on [him]." Similarly, Dr. Gautam Agarwal—a staff surgeon at the VAMC—stated that "the [VAMC] vascular surgeons do not tell the contract interventional radiologists employed by [VRA] how to perform a procedure, nor do they give technical guidance into the course of action that a contract interventional radiologist should take." As the district court put it, "[t]he VAMC physicians consulted with Dr. Riggans about patients, but did not tell him how to conduct procedures or how to treat an ailment."

Dutton argues that because the VAMC supplied Dr. Riggans's equipment, facilities, and patients, he should be treated as its employee. However, we agree with the Tenth Circuit that this makes little difference: "[w]hen a physician shows up to work in today's world—either as an independent contractor or a full-fledged employee—he no longer is likely to carry all relevant medical instruments in a black satchel." Tsosie, 452 F.3d at 1164. Whether the VAMC provided Dr. Riggans with equipment does not affect our analysis of its control of his day-to-day

6

activities.  Dutton also points to Dr. Riggans's VAMC identification card which listed him as an "employee."  However, this detail does not overcome the myriad other facts suggesting he was an independent contractor.  In short, the district court did not err in finding that Dr. Riggans was an independent contractor for purposes of the FTCA.[2]

## IV.

Next, we address the district court's grant of the government's motion to exclude the expert testimony of Dr. Michael A. Bettmann.

## A.

Dutton preliminarily argues that because this case arises under federal law, the district court should have applied the Federal Rules of Evidence, not O.C.G.A. § 24-7-702.  To the contrary, in McDowell v. Brown, 392 F.3d 1283 (11th Cir. 2004), we held that O.C.G.A. § 24-7-702 applies where a federal court exercises supplemental jurisdiction over a Georgia medical malpractice action.  Id. at 1295.  Although the general rule is that the Federal Rules of Evidence govern in diversity suits, this Court reasoned that Georgia's evidentiary rules are so intimately

---

[2] Our decision in Bravo v. United States, 532 F.3d 1154 (11th Cir. 2008), is readily distinguishable.  The contract in that case specifically stated that "[t]he contractor OB/GYN physician activities shall be subject to day-to-day direction by Navy personnel in a manner comparable to the direction over Navy uniformed and civil personnel engaged in comparable work."  Id. at 1160 (alteration omitted).  The contract also specified that contract doctors must "comply[] with directions received from Navy hospital professional personnel in the course of patient care activities."  Id. (alteration adopted).  There are no such provisions in VRA's contract.

7

intertwined with its medical malpractice laws that it would create an Erie conflict not to apply the state evidentiary rules in federal court.  Id.

This, of course, is an FTCA case, not a supplemental-jurisdiction case, so the Erie doctrine does not apply.  However, in FTCA cases, "the extent of the United States' liability . . . is generally determined by reference to state law." Molzof v. United States, 502 U.S. 301, 305, 112 S. Ct. 711, 714 (1992).  And Federal Rule of Evidence 601 instructs that in civil cases, "state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision."  Thus, although not controlling, we believe that our decision in McDowell is persuasive here.  Georgia's evidentiary rules for a physician's expert testimony are so intimately intertwined with its malpractice laws that the rules must apply in an FTCA case for medical malpractice.  That understanding accords with the holding of at least one sister Circuit.  See Liebsack v. United States, 731 F.3d 850, 855–56 (9th Cir. 2013) (holding, in an almost identical case, that Alaska Statute § 09.20.185 applies in a FTCA action based on medical negligence).  In short, we agree with the district court that O.C.G.A. § 24-7-702 applies here.[3]

### B.

Next, Dutton argues that even applying Georgia's evidentiary rules, the

---

[3] Dutton argues that O.C.G.A. § 24-7-702 should not apply because the Georgia Supreme Court has held that the statute is procedural.  See Nathans v. Diamond, 654 S.E.2d 121 (Ga. 2007).  However, Nathans decided that statute was procedural only for purposes of retroactivity, and said nothing about its application in federal courts.  Id. at 125.

8

district court wrongly excluded the testimony of Dr. Michael Bettmann.  "We review a district court's ruling on the admissibility of expert testimony for abuse of discretion."  McDowell, 392 F.3d at 1294.  "[W]e do not apply a stricter standard even though the ruling results in a summary judgment."  Id.  "[T]o qualify as an expert in a medical malpractice action [in Georgia], the witness must (1) have actual knowledge and experience in the relevant area through either 'active practice' or 'teaching' and (2) either be in the 'same profession' as the defendant whose conduct is at issue or qualify for the exception to the 'same profession' requirement."[4]  Hankla v. Postell, 749 S.E.2d 726, 729 (Ga. 2013).

"In order to determine whether OCGA § 24-7-702(c) authorizes the admission of [expert] testimony, it is necessary in this case to accurately state both the area of specialty at issue and what procedure or treatment was alleged to have been negligently performed."  Toombs v. Acute Care Consultants, Inc., 756 S.E.2d 589, 593 (Ga. Ct. App. 2014) (quotation marks omitted).  Georgia courts have made clear that "the area of specialty is dictated by the allegations in the complaint, not the apparent expertise of the treating physician."  Id.  Here, Dutton's complaint alleges negligence for failing "to implement emergent medical

---

[4] "Under the exception, a proffered expert who is a physician is permitted to qualify as an expert as to a non-physician health care provider, but only if she has knowledge regarding the relevant standard of care as a result of having supervised, taught, or instructed such non-physician health care providers."  Hankla, 749 S.E.2d at 729 (alteration omitted) (quotation marks omitted).  We agree with the district court that Dr. Bettmann is not competent to testify as to non-physician conduct because "[t]here is nothing in the record showing that [he] taught, supervised, or instructed non-physician health care providers."

care and treatment" following "an acute thromboembolic event . . . in Mr. Dutton's right leg." Thus, as the district court found, "the primary treatment at issue is the management of an emergent leg ischemia in a patient with critical mesenteric ischemia."

The district court did not abuse its discretion when it excluded Dr. Bettmann's testimony about whether the defendants negligently managed the care of a patient suffering from critical ischemia. The important distinction here is between vascular radiology and vascular surgery. According to Dr. Bettmann, "the training in vascular surgery is in surgical procedures," while "[t]he training in [vascular] radiology is in imaging and use of imaging to perform procedures." Dr. Bettmann testified that he was board certified in vascular and interventional radiology, but was not certified or trained in vascular surgery. He testified that interventional radiologists are not trained to perform surgeries and that he had never done one himself.

His lack of expertise as a vascular surgeon, or in broadly treating a patient suffering from critical ischemia, is fatal to his ability to testify about the VAMC's alleged negligence in this case. Dr. Bettmann's primary contention was that once Bartow Dutton showed symptoms like a cold, pulseless leg, the VAMC team should have performed one of two procedures within four to six hours: either (1) thrombolytic therapy or (2) surgical thrombectomy. Thrombolytic therapy

10

involves the use of drugs to break up or dissolve blood clots. However, Dr. Bettmann actually testified that he could "not say[] that [thrombolytic therapy was] something that should be done" because of Dutton's ischemia of his intestines. See also id. ("I think you could make a good point about the contraindication."). As for surgical thrombectomy, Dr. Bettmann had never performed the procedure that he thought should have been done here, and testified that he did not "know how hard or easy it would have been in Mr. Dutton."

More broadly, the government's expert—Dr. Jacob Robison—summarized the problem inherent in Dr. Bettman's proposed testimony:

> [I]nterventional radiologists are not trained as vascular surgeons and have no experience with surgical judgment and techniques required to manage patients with a complex arterial problem in the context of a life threatening situation.
>
> As an interventional radiologist, Dr. Bettmann . . . has no clinical experience in performing vascular surgery procedures, like the surgery that he indicates should have been performed on Mr. Dutton by Dr. Ramirez on the evening of June 2, 2010.

Speaking to Dutton's situation here, Dr. Robinson emphasized that the "simultaneous compromise of circulation to both the right leg and the intestine" presented "a very difficult and challenging problem from the beginning." Lytic therapy was "relatively contraindicated . . . as the [intestinal] bleeding may have been exacerbated by the clot-dissolving therapy." And "[t]he mesenteric ischemia was judged immediately more life threatening than the leg ischemia appeared to be

11

immediately limb threatening, and concerns about the bowel preempted any attempt to save the leg with a long, complex surgery."  Although Dutton may be right that "it does not take a vascular surgeon to know that a blood clot which prevents blood flow to a leg will cause that limb to die," the district court was right that it "takes a vascular surgeon to know when intervention to save the limb of a critically ill patient will not kill the patient in the process."  The district court did not abuse its discretion.

V.

Because the district court did not abuse its discretion when it excluded Dr. Bettmann's testimony, we also affirm the district court's grant of summary judgment.  Under Georgia law, "[t]o recover in a medical malpractice case, a plaintiff must demonstrate, by expert testimony, a violation of the applicable medical standard of care and also that the purported violation of or deviation from the proper standard of care is the proximate cause of the injury sustained."  Porter v. Guill, 681 S.E.2d 230, 235 (Ga. Ct. App. 2009) (alterations adopted) (emphasis added) (quotation marks omitted).  Because Dutton's only expert was properly excluded, the United States was entitled to summary judgment.

**AFFIRMED.**